ESSEX ELECTRO ENGINEERS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–174C.

United States Claims Court.

April 5, 1991.

Charles E. Raley, Washington, D.C., for plaintiff. James S. Phillips, of counsel.

Joan M. Bernott, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant. James P. Fuerstenberg, Office of Defense Logistics Agency, of counsel.

## OPINION

BRUGGINK, Judge.

Defendant has filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to consolidate with this proceeding two appeals pending before the Armed Services Board of Contract Appeals ("ASBCA"). Also pending are plaintiff's motion for summary judgment and its motion for sanctions. The principal sums due to plaintiff under three change orders have been paid as a result of administrative settlement. This action concerns plaintiff's attempt to recover interest on those settlement sums from the date it made submissions purporting to be claims under the Contract Disputes Act ("CDA").[1] The issue is whether plaintiff's submissions constitute claims cognizable under the act. Defendant contends that there was no dispute between the parties at the time plaintiff submitted its claims, and therefore the submissions were of no effect for purposes of commencing the running of CDA interest. For the reasons which follow, the court concludes that claims were not submitted, and that defendant's motion to dismiss, which will be treated as a motion for summary judgment, is thus due to be granted. Defendant's motion to consol-

idate is denied. Plaintiff's motion for summary judgment and its motion for sanctions are denied.

## FACTUAL BACKGROUND

Although defendant's motion is cast as one pursuant to RUSCC 12(b)(1), dismissal for lack of subject matter jurisdiction, the Federal Circuit has recently taught that a contention that an action is barred by the one year limitations period does not raise a question as to the court's subject matter jurisdiction, but rather suggests that plaintiff has not stated a claim upon which relief can be granted. *Borough of Alpine v. United States*, 923 F.2d 170 (Fed.Cir.1991). The same rationale would apply in the present circumstance. There is no question that the court has jurisdiction over claims brought under the CDA. The question is whether the facts alleged would constitute an actionable claim. Accordingly, defendant's motion will be treated as brought under RUSCC 12(b)(4). Since defendant has submitted materials outside the pleadings, its motion will be considered under RUSCC 56. Plaintiff has filed a motion for summary judgment with extensive exhibits. Defendant has responded to the motion and has offered numerous exhibits of its own along with an affidavit. The court concludes that the issues are joined and can be completely disposed of on summary judgment.

After carefully examining the parties' submissions, including defendant's exceptions to plaintiff's proposed findings of fact, the court finds the facts to be as further described herein. The facts found are not controverted, and thus can form the basis for addressing the cross-motions for summary judgment.

While recognizing that the primary issue is whether the submissions at issue were "claims," the court will refer for convenience to those submissions in the same way plaintiff did at the time. The fact that plaintiff referred to a submission as a claim, or treated it as such, does not mean

---

1. 41 U.S.C. §§ 601–613 (1988).

the court accepts that designation as having controlling legal significance.

The claims at issue arise from a single contract. On July 26, 1985 Essex Electro Engineers, Inc. ("Essex") agreed with the Naval Regional Contracting Center[2] to overhaul and reconfigure 122[3] of the Navy's mobile electric power plants. During contract performance, several change orders were issued. The three claims at issue each relate to a particular type of increase in the contract work requirements brought about by these change orders, and the following discussion will track their separate chronologies. What all three share is a common assertion that an Essex submission to the Administrative Contracting Officer ("ACO") during implementation of the change orders constituted a claim within the meaning of the CDA, and thus began to accrue interest.

1. *The 100 Percent Replacement Parts Change Order*

On November 20, 1985, the ACO sent a letter to Essex asking it to submit a cost proposal for a change order that would modify the contract to specify that certain listed parts would be subject to a 100 percent replacement requirement. The Navy specifically asked Essex to "furnish a cost proposal, for the inclusion of listed items into subject contract...." Essex responded on February 14, 1986 with a letter from its President, F.J. Pawlowski. He wrote that "we are herewith submitting our estimated cost proposal [per unit] for the items to be added to the 100 percent Replacement Items Listing.... Please issue a contract change to incorporate selling price into the contract."

On October 7, 1986, the ACO unilaterally executed a change order, A00004, directing the addition of the 100 percent replacement parts list. Price was to be negotiated: "An equitable firm-fixed price for this change order shall be negotiated with an appropriate Supplemental Agreement." The effec-

tive date of the change order was October 3, 1986.

On April 13, 1987, Essex submitted a revision to its earlier cost proposal. The revised cost proposal reduced somewhat the overall per-unit cost for the change order. The letter from Pawlowski noted that "prices are based upon purchase orders and cost estimates. The engineering and labor hours are estimates based on our experience in reviewing the work to be performed and estimating what the direct labor and engineering time and cost will be." The letter demanded the sum of $448,746.50, and closed with a certification paragraph plainly drafted to conform to the CDA. The letter also recites that "Essex's rights to a delay claim are reserved." Enclosed with the letter was a Form 1411, "Contract Pricing Proposal Cover Sheet." The letter did not specifically call for a final decision by the ACO.

In February 1988, the parties executed an amendment to the contract (amendment A00026), which "definitized" change order A00004. The parties agreed on a "firm-fixed price" for the change order of $339,429. The substance of what was required, i.e., the replacement parts list, was the same as that set forth in A00004. The effective date of the amendment was set as December 31, 1987. In a separate but contemporaneous letter, Essex notified the Navy that its agreement to the amendment was without prejudice to its position that "government actions, inactions, and changes have delayed contract performance, and Essex has consistently reserved its delay and disruption costs in negotiating equitable adjustment settlements." The ACO agreed to this reservation of rights.

On February 29, 1988, Essex submitted an invoice for the entire amount of the amendment. Payment was made on March 14, 1988.

On May 25, 1989, Essex mailed a letter to the ACO which held itself out to be a "claim for interest due on the payment

---

2. The procuring entity subsequently changed to the Naval Air Engineering Center. Both entities will be referred to throughout as "the Navy."

3. The Navy terminated three units for its own convenience. Claims arising out of that partial termination are pending before the ASBCA.

made on the certified claim arising from [Change Order A00004]. We request your final decision on this claim within sixty days in accordance with the [CDA]." The substance of the four-page submission was that Essex was entitled to interest on the entire amount invoiced as of April 13, 1987, the date of the revised cost proposal/claim. The amount claimed was $27,486.82.

By letter of July 27, 1989, the ACO indicated that a final decision was being prepared, but that Essex had to submit certain additional information. Essex responded timely but, for aught that appears, did not furnish any of the information requested.

On October 20, 1989, the ACO issued a final decision on the claim for interest. The decision granted a limited amount of interest based on the disputes clause in the contract, which allowed interest on claims "on the amount found due and unpaid from (a) the date the contracting officer receives the claim ... or (b) the date payment would otherwise be due, if that date is later...." 48 C.F.R. § 33.208 (1985) (Federal Acquisition Regulation ("FAR")). The ACO noted that Essex began incremental shipments of units on May 7, 1987, and completed shipments on March 15, 1989. Out of the conviction that, under ordinary circumstances, payment would have been due 20 days after receipt of an invoice, and since shipment preceded invoice, the ACO calculated interest for each shipment for the period beginning 20 days after acceptance of the shipment until final payment, which occurred on March 14, 1988. Because there had been interim progress payments, moreover, the ACO credited those payments to principal payments as they came due. A total of $1,086 was allowed.

The ACO decision lists dates of delivery for the units. Delivery began on May 7, 1987 and continued until March 15, 1989, by which time all units had been delivered.

The ACO decision was subsequently modified on February 20, 1990. The method of calculating interest remained the same, but the base against which it was assessed increased. The revised amount of interest allowed was $4,630.87. That amount has not been paid.

## 2. The Support Equipment Change Order

On April 23, 1986, the Contracting Officer issued unilateral modification P00002. The purpose of the modification was to require the contractor to furnish material, parts, labor and services for the incorporation of "winterization kits" into each of the mobile power plants. It recited that it was an "unpriced Modification with a maximum amount of $581,940." The ACO was delegated authority to negotiate an equitable firm-fixed price for the change order although the modification went into effect immediately.

The modification called for submission by Essex of a price proposal within 30 days. It was anticipated that after various negotiation steps a final modification, with price, would occur within 150 days of receipt of the proposal. Essex proceeded to incorporate the kits into the units.

The documents and proposed findings do not make clear what occurred between April 23, 1986 and April 15, 1987. On the latter date, Essex submitted a "revision to our estimated cost proposal submitted ... 19 June 1986." The letter recites that prices are based upon "purchase orders and cost estimates. The engineering and labor hours are estimates based on our experience in reviewing the work to be performed and estimating what the direct labor and engineering time and cost will be." The letter purported to be a claim and was certified by Essex, acting through President Pawlowski. He further recited that, because more than 150 days had elapsed since the contractor had submitted its cost proposal, Essex was no longer bound by the maximum amount of $581,940. Attached to the letter was an executed Form 1411, "Contract Pricing Proposal Cover Sheet." The total amount claimed was $720,546.91.

Defendant performed an audit of the April 15 claim and issued it on December 23, 1987. After four days of negotiation, the parties agreed to an equitable adjustment in the amount of $629,000. Essex's acceptance, dated August 24, 1988, specifi-

cally reserved its "claim for delay and interest." In Amendment A00029, which was executed on March 2, 1989, the parties recited that all quantities had been delivered, with certain minor exceptions, and that claims for delay and interest were preserved. Essex sent an invoice on February 6, 1989 in the amount of $603,851.04 for 117 winterization kits previously shipped and accepted. It received payment on March 16 or 17, 1989.

On May 2, 1989, Essex wrote a letter to the ACO claiming interest under the CDA on the settlement sum, commencing on April 15, 1987 and running until payment. The total amount of interest claimed as of that date was over $115,000. On February 20, 1990, the ACO wrote a "final decision" letter allowing interest on the same basis as that allowed with respect to the replacement parts change order. The result was that interest was calculated from 20 days after shipment, regardless of the fact that the shipments were not invoiced until much later, and ended when payments were made. Total interest allowed was $22,-989.32. That amount has not yet been paid.

Essex's present claim is for approximately $125,000 in interest, which includes interest on the amount of the change order between April 15, 1987 and final payment in March 1989, along with interest on the interest allowed by the February 20 decision.

3. *The "Over and Above" Work Change Order*

On September 24, 1986, the ACO issued a unilateral modification to the contract, P00004. The total quantities under the contract were unaffected, but the work to be performed had the potential thereafter to increase. The amendment provided that the contractor could propose additional repairs and reconfigurations to the mobile power units beyond those contemplated by the original contract. If the "over and above" work was subsequently authorized, the price of the work would later be definitized.

Essex submitted an inspection report and a proposal for over and above work on each unit. Some reports dealt with several units. Apparently the unilateral modification of September 24, 1986 was in recognition of an ongoing practice because the first inspection report is dated February 13, 1986. It is typical of approximately half the reports: "In accordance with the contract, enclosed herewith is the Inspection Report for Serial [Unit] No. 4215. The additional cost for repair is $5,074.76. May we please have your approval so that we can start the work." The Government conducted price analyses on the proposals and presumably authorized additional work in each instance.

On January 26, 1987, Essex wrote the ACO concerning upcoming negotiations to price over and above work authorized up to that date. In his letter, President Pawlowski refers to the inspection reports as "claims."

Twenty-seven of the reports, beginning with the report of March 27, 1987, use language different than that of the first series of reports: "In accordance with the contract, enclosed herewith are Inspection Reports which contain a claim for equitable adjustment pursuant to the Contract Disputes Act. Reports and claims are submitted for the following [five] units." None of these reports are certified and none specifically call for an ACO decision on a claim. A comparison of the delivery dates with the dates of reports on the various units, as well as the wording of the reports/claims, makes clear that at the time the reports were submitted, delivery could not have taken place. It is obvious that they are requests for permission to proceed with work. Most of the deliveries took place over several months and in many cases over a year after the dates of the reports.

Negotiations on pricing resulted, on May 6, 1987, in a bilateral modification to the contract (A00010) adjusting the price upward by $42,887.42 to cover additional work on the five units covered by the March 27 report. Subsequently, 13 additional bilateral modifications were executed reflecting agreement on pricing the over and above work for the remaining units.

The ACO responded to the March 27 report/claim with a letter dated April 13, 1987. The change in character of the inspection reports confused the ACO and led her to assert that the additional work could not yet be the subject of a claim since there was no dispute.

On May 16, 1989, Essex submitted a claim for interest on the over and above claims, in the total amount, at that time, of $103,991.40. The ACO indicated on two occasions that a final decision would be forthcoming on the interest claim, but no decision has been issued.

## DISCUSSION

The plain import of the ACO's decisions with respect to the first two change orders is that she treated the April 13 and April 15, 1987 submissions, as well as the subsequent, separate interest claims, as claims under the CDA. Otherwise her reliance on the contract clauses relating to disputes and interest on claims would not have been relevant. She determined, in effect, that those submissions were claims, but held that interest would run only from the dates that interest would otherwise have been due under the contract. This analysis is based on FAR 52.233-1:

(g) The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Officer receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.

The context of this excerpt from the disputes provisions makes it plain that interest only comes into play if there is a claim under the CDA. The ACO's final decision awards interest based on alternative (2) of the interest clause because, under the contract, payment would not have been due until delivery and acceptance of the power units. The payments clause of the contract, taken from FAR 52.232-1, provides,

The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accept-ed, less any deductions provided in this contract.

■ The contract also permits a 20 day grace period as a prompt payment discount. Based on the uncontested dates of delivery and acceptance, as well as the referenced contract provisions, the ACO calculated interest to begin running 20 days after acceptance even though invoices were not submitted at that time. As the ACO pointed out, invoices were not submitted because the prices for the changes had not been definitized, due to no fault of Essex. Essex did not invoice the cost increases on these two change orders until virtually all deliveries had been completed. The ACO made the judgment, which the court finds eminently reasonable, that she would treat the invoices as dated *nunc pro tunc* to the various dates of acceptance.

It did not become clear until oral argument, however, that the Government does not wish to defend the ACO's analysis with respect to the first two change orders. Counsel argued that since valid claims had not been submitted, the disputes clause should not be invoked. Moreover, the Government took the position as a matter of contract interpretation that any payment on the settlement prior to the final invoice date was improper.

■ To take the last contention first, the court disagrees as a matter of contract interpretation that the ACO incorrectly construed the payment clause. The contract must be construed against the Government as drafter. The court finds that it would not have been within the contemplation of the parties that the requirement of an invoice would preclude an obligation of payment when delivery has been made and accepted, while the parties are delaying final price adjustment during negotiations, and while the government is analyzing pricing data. To hold otherwise would mean that a contractor would be obligated to finance government inventory for substantial periods of time due to a government-initiated change order.

■ The question then becomes, under any set of circumstances, would Essex

have been entitled to interest from the submissions of the April 13 and April 15, 1987 letters relating to the replacements parts change order and the support equipment change order? (The court will deal separately with the amendments related to over and above work.) As to these two change orders, it is theoretically not necessary, in disposing of plaintiff's claim for additional interest, to determine whether the April submissions were claims. It is the court's view that even if they were claims, the ACO correctly construed the statute and applicable FAR provisions to begin the commencement of interest with the date that payment would otherwise be due under the contract (plus the 20 day prompt payment period).

During oral argument, however, plaintiff made it clear that in its view the entire quantum of the change order price adjustments was due immediately upon receipt of the April submissions, even if work had not commenced, much less delivery completed. To accept this argument would normally result in a windfall to the contractor. Interest under the CDA was meant to encourage prompt dispute resolution by having the Government compensate for use of the contractor's money, not to punish the Government. *See* S.Rep. No. 1118, 95th Cong., 2d Sess. 32 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5266.[4]

Even though plaintiff's claims for additional interest on the underlying change order claims can be disposed of whether or not the claims were valid under the CDA, it becomes necessary to address that question for two other reasons. The first is that the primary basis of defendant's motion is that the submissions at issue were not claims within the meaning of the CDA, because at the time they were submitted, there was no dispute between the parties. The second reason, which will be addressed separately, is the fact that Essex submitted independent claims for interest. For those claims to have any validity, there must have been underlying quantum claims that triggered an obligation to pay CDA interest.

The CDA does not define the term "claim." It does, however, provide some guidance as to the form in which a claim should be submitted. Section 6 requires that a claim be in writing and shall be "submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). The regulations applicable to the contract at bar do provide a definition of the term:

> "Claim," as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.... However, a written demand or written assertion by the contractor seeking the payment of money exceeding $50,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

FAR 33.201. The reference in this definition to FAR 33.206(a) is to the standard process for initiating any new claim. It is not unique to vouchers or invoices. This definition therefore does not contemplate that vouchers metamorphose into claims

---

**4.** The FAR provisions defining a claim clearly contemplate that a claim can arise in the absence of a presently due and owing sum of money. *See* FAR 52.233–1. The complement to that definition is found in the interest clause, however, which provides that interest should not be due on a claim any earlier than would normally be the case under the contract payment provisions. It is unnecessary for the court to address the question of whether a CDA claim in this tribunal must be monetized. *Compare Continental Heller Constr. v. United States,* 21 Cl.Ct. 471 (1990); *Frawley v. United States,* 14 Cl.Ct. 766 (1988); and *Citizens Assocs., Ltd. v. United States,* 12 Cl.Ct. 599 (1987) *with Atkins Enterprises, Inc. v. United States,* 15 Cl.Ct. 644 (1988). In the present circumstances, the obligation for payment had already arisen under the contract.

merely by the reagent of dispute. A separate document constituting a claim must be submitted for resolution.

The Federal Circuit has recently resolved the question of whether this language at FAR 33.201 should be construed to limit claims to matters in dispute. In *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 878 (Fed.Cir.1991), the court held that "[c]learly, the FAR mandates that, *inter alia*, a claim must seek payment of a sum certain as to which a dispute exists at the time of submission." The court also relied on the disputes clause language, also found at the same FAR provision, "that a 'request for payment that is not in dispute when submitted is not a claim for purposes of the Act.'" *Id.* From these phrases, the court concluded,

> The language is not ambiguous, and means what it says: A contractor and the government contracting agency must already be *in dispute* over the amount requested. Unilateral cost proposals or correspondence suggesting disagreement during negotiations, while they may ultimately lead to a dispute, do not, for purposes of the Act, satisfy the clear requirement that the request be in dispute.

*Id.* (emphasis in original).

The Federal Circuit cited as additional support its decision in *Mayfair Constr. Co. v. United States*, 841 F.2d 1576, 1577 (Fed. Cir.), *cert. denied*, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). From this citation, it is apparent that differences in the wording of contract disputes clauses would not be a basis for distinguishing results in earlier decisions, as plaintiff here urges. It is also thus unnecessary to address plaintiff's argument that the trend

before the boards of contract appeals was to the contrary.[5] *See also Hoffman Constr. Co. v. United States*, 7 Cl.Ct. 518, 523 (1985) ("in order to have a legitimate claim, a dispute must exist"); *Esprit Corp. v. United States*, 6 Cl.Ct. 546 (1984), *aff'd*, 776 F.2d 1062 (Fed.Cir.1985) ("Congress wanted interest to run against the Government only when the Government delays in resolving *disputes*." (emphasis in original)).

■ This court concludes from *Dawco* that the parties must have reached something approaching impasse on some of the elements of the contractor's demand before a claim can arise.[6] Each case must turn, therefore, on the result of a factual inquiry into circumstances surrounding the events leading to the demand.

■ Pursuant to *Dawco*, the letters of April 13 and April 15, 1987 were not claims. Although there was nothing tentative about the assertion of rights, although the CDA was invoked, and although there was no question that a change order had taken place, it was not clear at that time that there would be a dispute as to the amount of compensation. The Government immediately commenced financial examinations of the claims, but the only indication that a dispute developed at any time is that Essex ultimately got less than the amounts demanded in the April letters. There is no evidence in the record that the parties were "discontinuing negotiations," or that a point was reached at which the "amount claimed was definitely in dispute." *Dawco*, at 879. The materials had not been delivered at the time of the April letters. Both letters were sent to accompany contract

---

5. *See, e.g., A. & J. Constr. Co.*, IBCA No. 2269, 87–3 BCA ¶ 19,965, 1987 WL 41069; *R.G. Beer Corp.*, ENG BCA No. 4885, 85–2 BCA ¶ 18,162, 1985 WL 16804; *Tera Advanced Servs. Corp.*, GSBCA No. 7109–NRC, 85–2 BCA ¶ 17,941, 1985 WL 16423; *Luedtke Engineering Co.*, ENG BCA No. 4556, 82–2 BCA ¶ 15,851, 1982 WL 7892. *But see Fortec Constr. Co.*, ASBCA No. 27601, 83–1 BCA ¶ 16,402, 1983 WL 7525. Plaintiff also contends that it would be an anomalous result if interest were disallowed under the present circumstances, when the bulk of the billings were confirmed, since interest is earned

under the CDA if the matter is in dispute and interest is earned under the Prompt Payment Act, Pub.L. No. 97–177, 96 Stat. 85 (1982), 31 U.S.C. §§ 3901–3907 (1988), upon submission of an invoice.

6. The final sentence of the first paragraph of FAR 33.201 provides that a submission can be converted into a claim (after resubmission) if it "is not acted upon in a reasonable time." It is not clear what would constitute an unreasonable time.

766

pricing proposal cover sheets. For aught that appears, the April letters were "unilateral cost proposals," *id.* at 878, as to which the record shows no government rejection.

The only indication of a possible future dispute surrounding the April 13 and 15 letters was plaintiff's reservation of claims for delay or interest. Clearly a reservation of a potential claim, unrelated to the subject of the pending negotiations, cannot constitute a present dispute. While the plaintiff may have been entitled under the regulation to force the Government to either make a decision or incur interest charges, *see supra* note 6, the claims at issue here do not arise in that context.

The events leading up to the April 1987 letters are too similar to those outlined in *Dawco* to permit a different result. Although the precise nature of the numerous pieces of correspondence which the court found insufficient in that case is not clear, it is clear that they were found deficient in that they constituted proposals and points of departure for negotiations. In like manner, the April 1987 letters in this case transmit "revision[s] to ... estimated cost proposal[s]." They were in response to invitations in the change orders to "negotiate[ ]" an equitable fixed price. The letter which the court in *Dawco* held to signal the existence of a dispute, although not part of the record, was conceded by the Government to be a claim and indicated to the court a condition in which "negotiations had clearly been abandoned, and the amount claimed was definitely in dispute." *Dawco,* at 879.

▆▆▆ The same conclusion applies *a fortiori* with respect to the inspection reports arising out of the over and above work claims. The two different types of reports are quoted above. The first type, used until March 27, 1987, makes no reference to the CDA. Neither type was a present demand for money due. Unlike the first two types of change orders, where the Navy had already ordered the modified work to proceed, the inspection reports are no more than requests for permission to proceed with repairs. A description of proposed

repairs and a request for permission to proceed is not a demand for payment. It is inherently conditional.

One issue remains. Plaintiff filed separate claims for recovery of interest on the quantum amounts claimed and ultimately settled. In her final decisions on those claims, as amended, the ACO decided that interest was due on the settlement of the 100 percent replacement parts change order in the amount of $4,630.87. That decision was issued on February 20, 1990. On that same date, the ACO awarded interest on the settlement of the support equipment kit change order in the amount of $22,989.32. Neither of these amounts has been paid. The question becomes, is Essex entitled to assert a CDA claim for interest on those amounts?

Interest on claims brought pursuant to the CDA is controlled by section 12 of the Act. 41 U.S.C. § 611. That section creates as a necessary condition to the award of interest that an amount be "found due [on the contractor's claim]." Plainly the claim contemplated by the act is one for an adjustment to the contract price. Interest is thus an adjunct to an underlying claim with respect to the principal liability. By the terms of the statute no interest arises absent some other claim. This is the plain import of *Nab–Lord Assoc. v. United States,* 230 Ct.Cl. 694, 700, 682 F.2d 940, 944 (1982). *See also Hoffman Constr. Co.,* 7 Cl.Ct. at 522.

▆▆▆ The submissions of May 2, 1989, May 16, 1989, and May 25, 1989 which seek interest on amounts paid for, respectively, support equipment, over and above work, and replacement parts, thus do not support an entitlement to money unless there had already been claims under the CDA. The fact that these submissions were properly certified and purport to be claims is irrelevant. If there were no CDA claims, a separate claim for interest would be ineffective, and if there had been CDA claims, a separate claim for interest would normally be a non-sequitur. Only if there had been a proper CDA claim, which was settled or acknowledged by the Government, but was then unpaid with respect to

interest, would there be potential for a separate interest claim. In that event, the court sees no impediment to treating the claim for acknowledged but unpaid interest as a proper, separate, CDA claim. The present circumstances do not give rise to just such a phenomenon, however, since the court has found that there were no underlying CDA claims.

## CONCLUSION

Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The motion for sanctions is denied as being without merit. Defendant's motion to consolidate the two board actions with this case is denied. The Clerk is directed to enter judgment dismissing the complaint. No costs.