**ESSEX ELECTRO ENGINEERS, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 91–5096.

United States Court of Appeals, Federal Circuit.

April 17, 1992.

Charles E. Raley, of Israel & Raley, Washington, D.C., argued, for plaintiff-appellant.

Joan M. Bernott, of the Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., and David M. Cohen, Director. Of counsel was James Fuerstenburg, of the Defense Logistics Agency, Chicago, Ill.

Before ARCHER, Circuit Judge, BENNETT, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

Essex Electro Engineers, Inc. appeals the summary judgment of the United States Claims Court denying Essex's claim for interest under the Contract Disputes Act (CDA). *Essex Electro Engineers, Inc. v. United States,* 22 Cl.Ct. 757 (1991). The Claims Court held that Essex's submissions were not CDA claims entitling Essex to interest because there was no dispute at the time they were made. However, we hold that the submissions are not claims because they did not seek a sum certain as a matter of right as required by the Federal Acquisition Regulation (FAR) which implements the CDA. Nevertheless, because the Claims Court correctly concluded that the government was entitled to judgment as a matter of law, we affirm.

## I. BACKGROUND

Essex contracted with the Naval Regional Contracting Center to overhaul and reconfigure 122 mobile electric power plants. Three change orders were issued during performance of the contract. The principal amounts due to Essex under the three change orders have been paid as a result of an administrative settlement. Essex now seeks interest on those amounts from the date it made submissions purporting to be claims under the CDA.

### A. The 100 Percent Replacement Parts Change Order

The first change order required that certain parts be subject to a 100 percent replacement requirement. In response to a letter from the Administrative Contracting Officer (ACO) requesting a cost proposal

for such a change, Essex submitted a cost proposal on February 14, 1986. On October 7, 1986, without ruling on Essex's proposal, the ACO unilaterally executed the change order which provided that "[a]n equitable firm-fixed price for this change order shall be negotiated with an appropriate Supplemental Agreement."

On April 13, 1987, Essex submitted a revised cost proposal which reduced the amount proposed earlier and noted that

> prices are based upon purchase orders and cost estimates. The engineering and labor hours are estimates based on our experience in reviewing the work to be performed and estimating what the direct labor and engineering time and cost will be.

Although the letter contained a certification in the form required by section 6 of the CDA, it did not request a final decision by the ACO.

In February 1988, the parties "definitized" the change order by executing an amendment to the contract. The "firm-fixed price" for the change order that was agreed to was less than that offered by Essex in its revised proposal. Upon Essex's submission of an invoice for the amount due under the amendment to the contract, the government made payment on March 14, 1988.

On May 25, 1989, Essex sent a letter to the ACO which purported to be a "claim for interest due on the payment made on the certified claim arising from the referenced Change Order. We request your final decision on this claim within sixty days in accordance with the [CDA]." Essex based this claim for interest on its April 13, 1987 submission of a revised cost proposal and requested interest for the period commencing with that date.

Without determining whether the April 13, 1987 submission was a CDA claim, which would entitle Essex to interest, the ACO allowed a limited amount of interest. Elaborating on the interest provision of the CDA, the FAR allows "interest on a contractor's claim on the amount found due

and unpaid from (a) the date the contracting officer receives the claim . . . or (b) the date payment otherwise would be due, if that is later. . . ." 48 C.F.R. § 33.208 (1991). Because payment ordinarily would be due 20 days after receipt of an invoice, and because shipment preceded the invoice, the ACO calculated interest for each shipment for the period beginning 20 days after acceptance of the shipment until final payment. To arrive at the final interest amount due, the ACO also credited progress payments to the principal payments as they came due. The final interest amount found to be due, however, has not been paid by the government.[1]

### B. The Support Equipment Change Order

The same basic sequence of events occurred with respect to the second change order. On April 23, 1986, the ACO issued a unilateral modification to the contract. This change order required that the contractor furnish material, parts, labor and services for the incorporation of "winterization kits" into each of the mobile power plants. It also required that Essex submit a price proposal within 30 days. The record is unclear as to whether a submission was made immediately following the change order; however, on April 15, 1987, Essex submitted a "revision to our estimated cost proposal submitted . . . 19 June 1986." Once again, the letter stated that prices were based upon

> purchase orders and cost estimates. The engineering and labor hours are estimates based on our experience in reviewing the work to be performed and estimating what the direct labor and engineering time and cost will be.

This letter held itself out to be a "claim" and was certified. It was never decided by the ACO. However, after an audit and several days of price negotiation, the parties executed an amendment on March 2, 1989. Upon Essex's submission of an invoice to the government for the amount due under the amendment to the contract,

---

1. After his final decision, the ACO modified the base against which interest was calculated. The interest amount originally found to be due, $1,086, was increased to $4,630.87.

it received payment on March 16 or 17, 1989.

On May 2, 1989, Essex sent a letter to the ACO which held itself out to be a claim for interest under the CDA on the settlement sum. Essex based this claim for interest on its revised cost proposal dated April 15, 1987. Once again, without ruling on whether the April 15, 1987 letter constituted a claim, the ACO allowed a limited amount of interest calculated from 20 days after shipment. This interest has not been paid.

### C. The "Over and Above" Work Change Order

On September 24, 1986, the ACO issued another unilateral modification to the contract. This change order allowed the contractor to "propose additional repairs and reconfigurations to the mobile power units beyond those contemplated by the original contract." *Essex*, 22 Cl.Ct. at 762. Under this amendment, Essex submitted inspection reports which included proposals for "over and above" work on each unit. Each proposal indicated what the additional costs for repairs would be and requested government approval to proceed with the additional work. For all "over and above" work proposed by the contractor that was authorized by the government, the price was later definitized.

The inspection reports prior to the March 27, 1987 report were not themselves labeled as "claims"; however, in a letter dated January 26, 1987, Essex referred to all of the prior inspection reports as claims. The March 27, 1987 report, and all subsequent reports, were characterized on their face as "claims." However, none of the reports demanded a decision by the ACO as all were mere proposals for additional work.

Because the government approved of the work proposed in the March 27, 1987 inspection report, price negotiations were initiated. These negotiations resulted in the execution of a bilateral modification to the contract establishing prices for the "over and above" work involved. Similarly, thirteen additional bilateral modifications re-

sulted from the over and above work proposed in subsequent inspection reports.

By letter dated April 13, 1987, the ACO informed Essex that the additional work set forth in the inspection reports could not yet be the subject of a claim since there was no dispute. On May 16, 1989, Essex submitted a claim for interest on the additional cost for the over and above work. The ACO never issued a decision on this claim. No interest amount was ever paid.

On April 5, 1991, Essex filed suit in the Claims Court seeking interest on the principal amounts due under the three change orders. Essex maintained that the interest should be calculated from the date it made submissions purporting to be claims under the CDA. The Claims Court held that Essex's submissions were not CDA claims entitling Essex to interest because there was no dispute at the time they were made. In a motion for reconsideration of the Claims Court's judgment, Essex requested that it be allowed to amend its complaint to proceed under the Prompt Payment Act. The Claims Court held that the motion should be treated as a motion to amend but that it was untimely because it was filed after entry of judgment.

## II. ISSUES PRESENTED

A. Does the executive branch have regulatory authority to define "claim" under the Contract Disputes Act?

B. Is the regulatory definition consistent with the statute and reasonable?

C. Has the regulation been properly applied in this case?

D. Did the Claims Court abuse its discretion in denying Essex's post-judgment motion to amend its complaint to incorporate the provisions of the Prompt Payment Act?

## III. ANALYSIS

### A. Regulations Are Authorized by Statute

■ Essex argues that section 6(g) of the Office of Federal Procurement Policy Act (the "OFPP Act") limits the executive's

authority to issue regulations to only those areas specified; and therefore, since the OFPP Act does not specify the CDA, the executive does not have authority to issue any regulations affecting the CDA. Section 6(g) of the OFPP Act states that "[e]xcept as otherwise provided by law, no duties, functions, or responsibilities, other than those expressly assigned by this chapter, shall be assigned, delegated, or transferred to the Administrator [of OFPP]." 41 U.S.C. § 405(g) (1988).

Although the OFPP Act does not explicitly mention the CDA, section 6(a) of the Act nevertheless does broadly authorize the executive to issue regulations, including regulations affecting the CDA. Section 6(a) provides: "[T]he Administrator [of OFPP] may prescribe Government-wide procurement policies. These policies shall be implemented in a single Government-wide procurement regulation called the Federal Acquisition Regulation and shall be followed by executive agencies...." 41 U.S.C. § 405(a) (1988). By its very terms, the CDA applies to contracts involving government procurement.[2] Accordingly, the executive, specifically the OFPP, does have authority to issue regulations implementing the CDA, and that authority is broad enough to encompass regulations defining "claim."

### B. The Applicable Regulation Is Consistent with the CDA

■ Having determined that the OFPP has authority to issue the regulations, we must then determine whether the governing regulation as issued is consistent with the statute. In so doing, we must give deference to the interpretation of the statute of the agency charged with implementing it. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81

L.Ed.2d 694 (1984). If the agency's interpretation of the statute as set forth in the regulation is reasonable, ordinarily it must be upheld. *Id.* at 844.

The statutory section at issue provides:

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter.

41 U.S.C. § 605(a) (1988). Included among the provisions of the FAR issued by the OFPP to implement this statutory section is a definition of the term "claim":

*Claim*, as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.

48 C.F.R. § 33.201 (1991).

Accordingly, with respect to a claim for money, three requirements are set forth in the regulation, all of which must be met for a submission to constitute a "claim": (1) the demand or assertion must be in writing, (2) the money must be sought as a matter of right, and (3) the writing must set forth a sum certain. As for the requirement that the claim be submitted in writing, the statute itself expressly requires a written submission.

The second two requirements are consistent with the ordinary plain meaning of the

---

**2.** Section 3 of the CDA, entitled "Applicability of law," provides:

Unless otherwise specifically provided herein, this chapter applies to any express or implied contract ... entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

41 U.S.C. § 602 (1988).

term "claim." The *Webster's Ninth New Collegiate Dictionary* (1990) defines claim as "to ask for especially as a right." Thus, the dictionary definition of "claim" supports the reasonableness of the requirement that the money be sought as a matter of right. Moreover, for a payment of money to be sought as a matter of right, a sum certain naturally must be asserted. It is, after all, the defining measure of that right. Because neither the statute nor its legislative history otherwise defines "claim" or suggests that the word is intended to have some meaning other than its ordinary plain meaning, the FAR definition is reasonable, and must be upheld.

■ Essex next argues that because the executive failed "to comply with the rulemaking procedures of the Administrative Procedures Act in either the drafting or application of [the regulations]," it has been denied "administrative due process."[3] But the Administrative Procedure Act (APA) expressly exempts from its application "a matter relating to ... public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2) (1988). Essex maintains that this exemption does not apply because the regulation at issue applies not only to procurement contracts but also to the contents of all agreements entered into by the government with private parties. This argument is unpersuasive because nothing in the APA limits the "public contracts" exemption, and the CDA plainly concerns, *inter alia,* government procurement contracts. Thus, in promulgating the FAR regulations, the executive was not required to follow APA requirements.

### C. The FAR Was Applied Properly in this Case

■ Essex seeks interests on amounts found due and paid as a result of the three settlement agreements. Essex alleges that the government owes it interest from the date it made submissions which purport to be, or which were later characterized by Essex as, "claims" under the CDA.. With respect to the 100 Percent Replacement Parts Change Order and the Support Equipment Change Order, Essex alleges that its revised cost proposals dated April 13, 1987 and April 15, 1987, respectively, were claims entitling it to interest. With respect to the "Over and Above" Work Change Order, Essex alleges that each of its inspection reports was a claim entitling it to interest.

The CDA allows "[i]nterest on amounts found due contractors on claims ... from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor until payment thereof." 41 U.S.C. § 611 (1988). Thus, a necessary predicate to entitlement to interest is the submission of a claim.

To determine whether the submissions purporting to be claims did constitute claims under the CDA, we must ascertain whether the requirements of the statute and the FAR were satisfied. The statute requires that the claim be submitted in writing and that it be submitted to the contracting officer for a decision. 41 U.S.C. § 605(a). While the submissions at issue clearly satisfy the first requirement of a writing, it is not clear whether the second requirement is satisfied. The statute does not make clear whether a request for a decision must be made explicitly or whether it may be found implicit in the writing. We do not need to answer this question, however, because it is clear that the FAR's requirements for a claim are not met by any of the submissions at issue.

In addition to a writing, the regulations require that a sum certain be sought as a matter of right. Because the April 13, 1987 submission for the 100 Percent Replacement Parts Change Order and the April 15, 1987 submission for the Support Equipment Change Order were mere "pro-

---

3. Essex also argues that the regulations are inherently ambiguous because subsequent language allows for an interpretation requiring a dispute for entitlement to interest. Essex alleges that it has a property right to interest on a claim and that it has been denied substantive due process because of the additional "dispute requirement" for entitlement to the interest. Because no "dispute requirement" is applied by us in the instant case, *see infra,* we need not address this argument.

posals" for "work to be performed," neither of these submissions asserted anything as a matter of right.

Likewise, the inspection reports submitted pursuant to the "Over and Above" Work Change Order, did not seek a sum certain as a matter of right. The reports served merely to propose additional repairs for possible approval by the government. As such, payment for any services subsequently approved could not possibly have been asserted as a matter of right in these reports.

Because the April 13, 1987 and the April 15, 1987 revised cost proposals and the inspection reports did not seek a sum certain as a matter of right, they were not claims under the CDA. Although the Claims Court used a distinctly different analysis to find that the submissions were not claims, the Claims Court judgment must be affirmed because its conclusion that interest must be denied was proper.

The Claims Court relied on *Dawco Constr., Inc. v. United States,* 930 F.2d 872 (Fed.Cir.1991), to determine that the submissions were not claims under the CDA. Essex argues that the court's reliance on *Dawco* was improper because neither the CDA nor its legislative history supports *Dawco's* requirement that the contractor refuse to participate in settlement negotiations or otherwise create a dispute before a CDA claim can exist and the right to interest is preserved.

Where, as here, the first three regulatory requirements themselves are not met, there is no need to discern whether a dispute exists. Here, considered against the first three FAR requirements, the submissions clearly are not claims.

■■■ Essex also argues that the ACO made a binding concession that the April 13, 1987 and the April 15, 1987 submissions were "claims" by allowing some interest on them. Essex asserts that this concession should entitle it to interest on those claims just as the government attorney's concession in *Dawco* entitled Dawco to interest on admitted claims. This argument is not persuasive. The submission in *Dawco* that was conceded by the government to be a

claim was not in the record before the Federal Circuit or the Claims Court. *Dawco,* 930 F.2d at 879. In determining whether the absent submission was a claim, the Federal Circuit considered both the government's statements regarding the submission and the description of the submission found in the record. *Id.* The government's "concession" was not dispositive of the issue, but merely provided additional evidence on which to base a decision. Moreover, that the government is bound by concessions in court of its attorneys does not mean it must also be bound by prelitigation viewpoints of its contracting officer, who never addressed whether the submission was a "claim."

In the instant case, however, the submissions at issue are in the record. The trial judge independently assessed the adequacy of the submissions as "claims." In any event, the ACO's decision to allow interest that the government then refused to pay cannot be properly characterized as a "concession" by the government as a contracting party. Moreover, before the Claims Court and this court, the government has consistently denied the existence of any claims.

### D. Motion to Amend Complaint

■■■ In a motion for reconsideration of the Claims Court's grant of summary judgment, Essex requested that it be allowed to amend its complaint to proceed not under the CDA but under the Prompt Payment Act (PPA), 31 U.S.C. § 3901, *et seq.* (1988). The Claims Court held that the motion should be treated as a motion to amend but that it was untimely because it was filed after entry of judgment.

On appeal, Essex argues that it had implicitly moved to amend its complaint prior to judgment. In support of this argument, Essex points to portions of the hearing record in which during argument on the motion the trial counsel discussed the PPA. Essex argues that those references to the PPA "should have been construed as a motion to amend." Because no responsive pleading had yet been filed, Essex argues

that it should be entitled to amend its complaint once as a matter of right. *See* RUSCC 15(a).

The Claims Court ruling must be upheld. Most importantly, a motion to amend made in the motion for reconsideration is clearly untimely. *Id.* Furthermore, Essex's "implicit motion" argument is unpersuasive. First, if Essex wanted to amend at that time, it could have either filed an amended complaint as a matter of right or requested leave of court to do so. *Id.* It failed to do either. Second, Essex has pointed to no authority, and we have found none, that requires the court to construe oral references to a particular statute during a hearing as a motion to amend the complaint. Indeed such a rule would make a mockery of pleadings and confront adverse parties with the potential for endlessly shifting grounds. We will not condone this practice. Accordingly, the judge did not abuse his discretion in denying Essex's post-judgment motion to amend.

## CONCLUSION

The executive branch has authority to issue regulations implementing the Contract Disputes Act, including OFPP's regulation defining the statutory term "claim." The regulatory definition of "claim" is consistent with the ordinary plain meaning of the word, is otherwise consistent with the statute, and is reasonable. Because the submissions in this case do not satisfy all of the FAR's requirements for a claim, they were not claims. Accordingly, Essex is not entitled to interest based on these submissions. The grant of summary judgment of no liability for the interest was therefore correct as a matter of law.

AFFIRMED.