**REFLECTONE, INC., Appellant,**

v.

**John H. DALTON, Secretary of the Navy, Appellee.**

93–1373.

United States Court of Appeals, Federal Circuit.

July 26, 1995.

Rehearing Denied Sept. 27, 1995.

Victor J. Zupa, Dickstein, Shapiro & Morin, L.L.P., Washington, DC, argued, for appellant. With him on the brief were Brian J. Siebel and Ellen MacDonald, of counsel.

Sharon Y. Eubanks, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Di-

rector. Also on brief was Robert C. Ashpole, Dept. of Navy, Washington, DC, of counsel.

David A. Churchill, McKenna & Cuneo, Washington, DC, was on the brief, for amicus curiae, Chamber of Commerce of U.S. With him on the brief were Alison L. Doyle and J. Keith Burt. Also on the brief was Robin S. Conrad, Nat. Chamber Litigation Center, Inc., Washington, DC, of counsel.

Stephen T. Owen, Marcus B. Slater, Jr., Lisa D. Goekjian, Jerald S. Howe, Jr., President and George E. Hutchinson, Executive Director, Washington, DC, were on the brief, for amicus curiae, Federal Circuit Bar Ass'n.

Gregory A. Smith, Piper & Marbury, Washington, DC, was on the brief, for amicus curiae, Nat. Security Indus. Ass'n, Aerospace Industries Ass'n of America, Inc. and Electronic Industries Ass'n. With him on the brief were Michael W. Clancy and Vincent S. Antonacci, Pettit & Martin, Washington, DC.

Before ARCHER, Chief Judge, SKELTON, Senior Circuit Judge, NIES, NEWMAN, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RICH, RADER, SCHALL and BRYSON, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Concurring opinion filed by Circuit Judge NIES.

MICHEL, Circuit Judge.

Reflectone, Inc. (Reflectone) appeals from the decision of the Armed Services Board of Contract Appeals (Board) dismissing Reflectone's appeal for lack of subject matter jurisdiction. *Reflectone, Inc.,* ASBCA No. 43081, 93–1 BCA ¶ 25,512, 1992 WL 302847 (1992). The Board held that Reflectone had not submitted a "claim" within the meaning of the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–13 (1988 & Supp. V 1993), as interpreted in the Federal Acquisition Regulation (FAR), because a dispute over the amount of money Reflectone asserted it was owed did not predate Reflectone's June 1, 1990 Request for Equitable Adjustment (REA), the purported claim. Board jurisdiction is grounded in the CDA which authorizes Board review only of a contracting officer's final decision on a "claim." The CDA, however, does not define "claim." Because we conclude that FAR 33.201 (1988), which alone defines "claim" for purposes of the CDA, does not require a pre-existing dispute as to either amount or liability when, as here, a contractor submits a non-routine "written demand ... seeking, as a matter of right, the payment of money in a sum certain," FAR 33.201, we hold that Reflectone's REA was a CDA "claim" and, therefore, the Board has jurisdiction. Accordingly, we reverse the dismissal and remand for adjudication of Reflectone's appeal from the contracting officer's decision on its merits.

## BACKGROUND

On April 15, 1988, Reflectone entered into a $4,573,559 fixed price contract with the Naval Training Systems Center in Orlando, Florida, requiring Reflectone to update helicopter weapon system trainers. The contract called for delivery of the first trainer on February 15, 1989, with the other three trainers to follow at three-month intervals. In a letter dated December 14, 1988, Reflectone advised the contracting officer (CO) that delivery of certain equipment was being delayed by late, unavailable or defective government-furnished property. In response, the Navy denied responsibility for the delay and issued a cure notice warning Reflectone that unless the condition endangering timely delivery of the equipment was eliminated within thirty days, the Navy might terminate the contract for default.

On January 17, 1989, Reflectone again wrote the CO that the delays were the fault of the government and requested an extension of the contract delivery schedule. Subsequently, the Navy modified two of the original four delivery dates but reserved its right to seek additional compensation for delay. After Reflectone advised the Navy that it would be unable to meet even the extended delivery dates due to faulty government-fur-

nished property, the CO indicated on May 5, 1989, that Reflectone was delinquent on the contract and that the Navy would seek compensation for the delay. Between May 1989 and April 1990, the contract delivery schedule was modified at least three more times and each time the Navy reserved the right to make a claim against Reflectone for delay. In response, Reflectone continued to inform the Navy that it considered the government to have caused all delays and that it would claim relief once the full economic impact of the delay was known.

On June 1, 1990, Reflectone submitted an REA to the CO demanding $266,840 for costs related to government-caused delay with respect to twenty-one enumerated items. Reflectone's President and CEO certified the REA and requested a decision from the CO. In the initial review of the REA, completed on January 15, 1991, the CO denied sixteen of the twenty-one items in their entirety, estimated entitlement in the remaining five items at $17,662, and advised Reflectone that a counterclaim and set-off, exceeding the amount requested by Reflectone, was being prepared.[1] On March 19, 1991, the CO rendered a final decision indicating that the government's position remained the same and advising Reflectone of its right to appeal to the Board.

Reflectone appealed the CO's final decision to the Board, which held that the REA was not a "claim" within the meaning of the Contract Disputes Act and, therefore, it did not have jurisdiction over the appeal. The Board relied on language from *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 878 (Fed.Cir.1991), stating, "A contractor and the government contracting agency must already be in dispute over the amount requested." *Dawco* also states "The [CDA] and its implementing regulation require that a 'claim' arise from a request for payment that is 'in dispute.'" *Id.* The Board interpreted *Dawco* as holding that no demand for payment could be a claim unless the *amount*

of the payment had been put in dispute. The Board reasoned that because Reflectone first requested a specific amount from the government in the REA, no dispute over the amount existed prior to the REA and, therefore, the REA could not be a claim according to its interpretation of *Dawco*. The Board explained:

> [W]e need not determine whether these issues [presented in the REA] had previously been submitted to the contracting officer and were in dispute. *Dawco* requires that the parties be in dispute over the amount requested. Clearly in the appeal before us, [Reflectone] had not quantified the impact of the delays on itself and communicated it to the Government prior to the 1 June 1990 REA. The failure of [Reflectone] to request any amount (and therefore a dispute could not exist over it) prior to its REA, renders [Reflectone's] 1 June 1990 REA incapable of being considered a claim under the CDA in accordance with the holding of *Dawco*.

93–1 BCA ¶ 25,512 at 127,056.

On appeal to this court, a divided, three-judge panel affirmed the Board's dismissal decision, accepting its interpretation of *Dawco* and its rationale, in an opinion dated September 1, 1994, now vacated. *Reflectone, Inc. v. Kelso*, 34 F.3d 1031 (Fed.Cir.) (withdrawn from bound volume), *vacated*, 34 F.3d 1039 (Fed.Cir.1994). Due to the exceptional public importance of the issue of first impression presented by this case concerning the proper definition of a CDA "claim," we granted Reflectone's Suggestion for Rehearing In Banc.Fed.Cir.R. 35.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (1988) and Section 8 of the Contract Disputes Act, 41 U.S.C. § 607(g)(1) (1988).

## STANDARD OF REVIEW

■ The CDA dictates the standards this court applies in reviewing decisions of agency

---

1. The CO forwarded a counterclaim to Reflectone for late and deficient contractor performance totaling $657,388 on November 8, 1991.

contract appeal boards. 41 U.S.C. § 609(b) (1988). A determination of CDA jurisdiction and interpretation of applicable procurement regulations present questions of law which we review *de novo. Santa Fe Eng'rs, Inc. v. Garrett,* 991 F.2d 1579, 1581 (Fed.Cir.1993).

## ANALYSIS

### I

A. *FAR 33.201 Does Not Require That A Payment Demanded In A Non–Routine Submission Be In Dispute Before The Submission To A Contracting Officer Can Be A "Claim"*

Under the CDA, a final decision by a CO on a "claim" is a prerequisite for Board jurisdiction. *Sharman Co. v. United States,* 2 F.3d 1564, 1568–69 (Fed.Cir.1993) (reviewing jurisdictional scheme of CDA). Because the CDA itself does not define the term "claim," [2] we must assess whether a particular demand for payment constitutes a claim, based on the FAR implementing the CDA, the language of the contract in dispute, and the facts of the case. *Garrett v. General Elec. Co.,* 987 F.2d 747, 749 (Fed.Cir.1993).[3] The FAR defines "claim" as:

[1] a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.... [2] A voucher, invoice, or other *routine request for payment that is not in dispute when submitted is not a claim.* [3] The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is

disputed either as to liability or amount or is not acted upon in a reasonable time.

FAR (48 C.F.R. §) 33.201 (emphasis added). The issue is whether sentence [2] adds a requirement to those stated in sentence [1] that applies to all submissions.

The government and the Board would require that before Reflectone's REA can qualify as a claim, it be preceded by a dispute over entitlement to and the amount of a demand for payment. According to the government, this requirement is mandated by the language of FAR 33.201. In order to explore whether a CDA "claim" requires a dispute which pre-dates the submission to the CO, we requested that the following question be addressed by the *in banc* briefs.[4]

Did *Dawco Constr., Inc. v. United States,* 930 F.2d 872 (Fed.Cir.1991), properly conclude that a Contract Disputes Act (CDA) "claim" as defined in FAR 33.201 requires a pre-existing dispute between a contractor and the government when the claim is in the form of a "written assertion ... seeking, as a matter of right, the payment of money in a sum certain" or other contract relief per the first sentence of the FAR definition, or does that requirement only apply when the claim initially is in the form of a "routine request for payment"?

We answer the first half of this question in the negative and the second half in the affirmative. We hold that sentence [1] of FAR 33.201 sets forth the only three requirements of a non-routine "claim" for money: that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain. That sentence simply does not require that entitlement to the amount asserted in the claim or the amount itself

**2.** The CDA, 41 U.S.C. § 605(a) (1988), states in relevant part:

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.

**3.** In this appeal, however, there are not unusual facts that would affect our decision. Nor is there a contract clause that controls. Thus, the FAR determines whether Reflectone submitted a "claim" to the CO.

**4.** We also requested that the *in banc* briefs address two additional, related questions. *See infra* notes 15 and 16.

already be in dispute when the document is submitted. The subsequent sentence does not add another requirement to a non-routine submission.

FAR 33.201 does not mention a dispute until the fourth sentence, sentence [2], which provides, "[a] voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim." Routine requests for payment, too, are "written demand[s] . . . seeking, as a matter of right, payment of money in a sum certain" and, therefore, appear to fall within the definition of claim recited in sentence [1] of FAR 33.201.[5] However, the FAR explicitly excludes from the definition of "claim" those "routine request[s] for payment" that are not in dispute when submitted to the CO.[6] Nevertheless, nothing in the definition suggests that *other* written demands seeking payment of a sum certain as a matter of right, i.e., those demands that are not "routine request[s] for payment," also must be already in dispute to constitute a "claim." Moreover, that the regulation specifically excludes only undisputed *routine* requests for payment from the category of written demands for payment that satisfy the definition of "claim" implies that all other written demands seeking payment as a matter of right are "claims," whether already in dispute or not. The inclusion of only one exception to the definition of "claim"—undisputed, routine requests—implies the exclusion of any others. *See United States v. Koonce,* 991 F.2d 693, 698 (11th Cir.1993) (applying canon of statutory construction *inclusio unius est exclusio alterius* ).

Our holding today that the FAR requires a "claim" to be a written demand seeking a sum certain (or other contract relief) as a matter of right, but not necessarily in dispute, is consistent with the ordinary meaning of the term "claim": "a demand for something due or believed to be due." *Webster's Ninth New Collegiate Dictionary* 244 (1990). That the demand is made as a matter of right constitutes the essential characteristic of a "claim" according to both the FAR and the dictionary definitions. *See Essex Electro Eng'rs, Inc. v. United States,* 960 F.2d 1576, 1580–81 (Fed.Cir.) ("[T]he dictionary definition of 'claim' supports the reasonableness of the requirement that the money be sought as a matter of right."), *cert. denied,* —— U.S. ——, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992). Nothing in the common definition of "claim," however, requires a pre-existing dispute before a demand as a matter of right can be a claim. Indeed, everything suggests the contrary.

Moreover, as Reflectone points out, it is illogical to require a dispute before a demand for payment rightfully due can be a "claim" because to have a dispute the contractor first must make a demand as a matter of right, i.e., a claim, that is then refused. Furthermore, neither the CDA, its legislative history, nor the FAR, nor its history, suggests that a dispute must pre-date the contractor's submission of the claim to the CO when the claim is in the form of a non-routine demand as of right.

The government argues, nevertheless, that a close reading of the regulation demonstrates that a "claim" always requires a pre-existing dispute. The government's analysis begins correctly by acknowledging that sentence [1] of the FAR, defining "claim" as "a written demand . . . seeking, as a matter of right, the payment of money in a sum certain" appears to include vouchers, invoices and other routine requests for payment. According to the government, because the regulation later makes clear that the drafters intended to exclude routine requests for pay-

---

**5.** We need not resolve whether the author of the regulation intended to distinguish between a "written *demand* " and a "routine *request.* "

**6.** The distinction excluding routine requests for payment from the definition of "claim" relieves COs from the requirement of issuing a CDA final decision on each and every voucher that the government is obligated to pay under the express

terms of the contract during its ordinary progression, including "progress payments." The process for converting such routine requests, if disputed, into claims assures that only those submissions that need final decisions will require them.

ment from the definition of "claim" unless they are in dispute, the question becomes one of distinguishing between non-routine written demands seeking the payment of a sum certain as a matter of right and "routine request[s] for payment." The government next asserts, incorrectly, that it is the existence of a dispute which distinguishes a non-routine "claim" from a routine request for payment and, therefore, every "claim" must involve a pre-existing dispute.

The government's interpretation of the FAR must fail, as a matter of logic, because it recognizes only two categories of potential claims, undisputed routine requests for payment, which do not satisfy the definition, and disputed non-routine written demands seeking payment as a matter of right, which do. This interpretation ignores a third category, undisputed, non-routine written demands seeking payment as a matter of right. Under the literal language of the FAR, however, the critical distinction in identifying a "claim" is not between undisputed and disputed submissions, but between routine and non-routine submissions.

To read the dispute requirement of sentence [2] of FAR 33.201 as applying to all submissions for payment, as the government suggests, one would have to construe *every* demand for payment as a matter of right as a "routine request for payment." However, this is clearly not so. For instance, an REA is anything but a "routine request for payment." It is a remedy payable only when unforeseen or unintended circumstances, such as government modification of the contract, differing site conditions, defective or late-delivered government property or issuance of a stop work order, cause an increase in contract performance costs. *Pacific Architects and Eng'rs Inc. v. United States,* 491 F.2d 734, 739, 203 Ct.Cl. 499 (1974). A demand for compensation for unforeseen or unintended circumstances cannot be charac-

terized as "routine." The Supreme Court has confirmed the non-routine nature of an REA by equating it with assertion of a breach of contract. *Crown Coat Front Co. v. United States,* 386 U.S. 503, 511, 87 S.Ct. 1177, 1181, 18 L.Ed.2d 256 (1967) ("With respect to claims arising under the typical government contract, the contractor has agreed in effect to convert what otherwise might be claims for breach of contract into claims for equitable adjustment."). Thus, an REA provides an example of a written demand for payment as a matter of right which is not "a routine request for payment" and, therefore, it satisfies the FAR definition of "claim" whether or not the government's liability for or the amount of the REA was already disputed before submission of the REA to the CO.[7]

A routine request for payment, on the other hand, is made under the contract, not outside it. For example, a voucher or invoice is submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled progression of contract performance. Similarly, progress payments are made by the government when the contractor completes predetermined stages of the contract. An REA can hardly be compared to an invoice, voucher or progress payment.

Thus, we hold that FAR 33.201 does not require that "a written demand . . . seeking, as a matter of right, the payment of money in a sum certain" must already be in dispute when submitted to the CO to satisfy the definition of "claim," *except* where that demand or request is a "voucher, invoice or other routine request for payment." This interpretation, based on the plain language of the FAR, examines and reconciles the text of the entire regulation, not simply isolated sentences. *See Beecham v. United States,* —— U.S. ——, ——, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994) ("The plain meaning that

---

7. We do not hold, however, that every non-routine submission constitutes a "claim" under the FAR. Those submissions which do not seek payment as a matter of right are not claims, a definition which excludes, for example, cost proposals for work the government later decides it would like performed. *See Essex Electro Eng'rs,* 960 F.2d at 1581–82 (excluding cost proposals and inspection reports from the FAR definition of a CDA "claim").

we seek to discern is the plain meaning of the whole statute, not of isolated sentences."). FAR 33.201, viewed as a whole, establishes a framework in which written demands seeking a sum certain as a matter of right are CDA "claims" with the only exception of "routine request[s] for payment" which may be converted to claims by the existence of a dispute and compliance with other requirements of conversion in FAR 33.206(a).[8] Routine requests are a subset of all written demands for payment. Special requirements apply to the subset, but not to the rest of the set.

Reflectone's REA is clearly "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain." Reflectone, a contracting party, submitted a written document to the CO demanding the payment of $266,840 which it asserted the government owed for delaying performance of the contract by furnishing defective goods. The submission was certified and requested a CO decision. Consequently, Reflectone's REA satisfies all the requirements listed for a CDA "claim" according to the plain language of the first sentence of FAR 33.201. The REA is not a "routine request for payment" and, therefore, the fourth sentence of the FAR definition does not apply here to require, *inter alia*, a pre-existing dispute as to either liability or amount. Because we conclude that Reflectone's REA is a "claim" according to the FAR, we further conclude that the Board has jurisdiction to review the CO's denial of Reflectone's REA.

### B.  Dawco's Holding Is Overruled

The Board and the government relied on language in *Dawco* to support the conclusion that a dispute as to amount is required be-

---

8.  We do not comment on those conversion requirements or any other requirements, that like certification, a contractor may have to satisfy to submit a CDA "claim" the CO has jurisdiction to decide.

9.  The cost proposal could not have been a claim within the meaning of FAR 33.201 because a cost

fore *any* demand for payment can be a CDA "claim." In that case, the Navy awarded Dawco Construction, Inc. (Dawco) a contract for landscaping work at a Naval housing project. The Navy then suspended work on the project, issued a Change Order Request and requested that Dawco submit a cost proposal for completing the Navy's suggested modifications. Dawco's subcontractor responded by proposing new costs in a May 21, 1984 letter which the Navy rejected. *Dawco,* 930 F.2d at 874. We held that the May 21, 1984 letter was merely a cost proposal[9] and not a "claim" as defined by FAR 33.201 because it was not a " 'request for payment in dispute' as contemplated by the Act and explicitly required by the regulation and [Dawco's] contract." *Id.* at 878. The court explained the origin of the dispute requirement:

> Clearly, the FAR mandates that, *inter alia,* a claim must seek payment of a sum certain as to which a dispute exists at the time of submission.

> Similarly, the contract's disputes clause, containing the standard language mandated by the Defense Acquisition Regulations states that a *"request for payment that is not in dispute when submitted is not a claim for purposes of the Act."* The language is not ambiguous and means what it says: A contractor and the government contracting agency must already be in dispute over the amount requested. Unilateral cost proposals or correspondence suggesting disagreement during negotiations, while they may ultimately lead to a dispute, do not, for purposes of the Act, satisfy the clear requirement that the request be in dispute. *Mayfair Construction Co. v. United States,* 841 F.2d 1576, 1577 (Fed. Cir.), *cert. denied,* 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988) ("It is beyond

proposal, by its nature as a negotiating position for unpriced work not yet done, is not ordinarily "a written demand, ... seeking, as a matter of right, the payment of money in a sum certain...." *See Essex Electro Eng'rs,* 960 F.2d at 1581–82.

cavil that under this clause, no claim exists unless it involves a dispute.").

*Id.* (emphasis added).

Although *Dawco* first held that the requirement that a "claim" be in dispute was explicit in that particular contract's disputes clause, the opinion also grounded that requirement in the language of the FAR. *Id.* ("The Act and its implementing regulation require a 'claim' arise from a request for payment that is 'in dispute.'"). To the extent that *Dawco* and its progeny [10] have been read to also hold that, based on FAR 33.201, a "claim" (other than a routine request for payment) must already be in dispute when submitted to the CO, they are hereby overruled. *See Texas Am. Oil Corp. v. Department of Energy,* 44 F.3d 1557, 1561 (Fed.Cir. 1995) (prior panel decisions on an issue are controlling until overruled *in banc* ).

An examination of *Mayfair,* mistakenly cited in *Dawco,* further supports our overruling the second holding of *Dawco* and instead holding today that the FAR 33.201 definition of "claim" does not require a pre-existing dispute *unless* the submission is a "routine request for payment." The *Mayfair* court interpreted and applied an interim regulation drafted by the Office of Federal Procurement Policy (OFPP) [11] defining "claim" as:

(1) a written request submitted to the Contracting Officer;

(2) for payment of money, adjustment of contract terms, or other relief;

(3) *which is in dispute* or remains unresolved after a reasonable time for its review and disposition by the Government; and

(4) for which a Contracting Officer's decision is demanded.

*Mayfair,* 841 F.2d at 1577 (quoting 44 Fed. Reg. 12,524 (1979)) (emphasis added). The statement in *Mayfair,* mistakenly quoted in *Dawco,* that "[i]t is beyond cavil that under this clause, no claim exists unless it involves a dispute," was based on this interim regulatory language incorporated into the contract's disputes clause explicitly requiring that a claim be in dispute when submitted. *Mayfair* did not concern the current FAR definition of "claim" which was promulgated after the interim definition quoted above and, therefore, *Mayfair* provides no support for requiring a pre-existing dispute in any case involving contracts resulting from solicitations issued after June 1, 1980.[12] *Id.* at 1578 (rejecting Mayfair's argument that revised regulation not requiring a dispute applied in that case because revised regulation applied

**10.** Four of our cases followed *Dawco* by requiring that a CDA "claim" be in dispute when submitted to the CO: *Bill Strong Enters., Inc. v. Shannon,* 49 F.3d 1541, 1544–45 (Fed.Cir.1995); *Sharman Co.,* 2 F.3d at 1571 (holding government letter to contractor seeking repayment of progress payments did not assert a government claim, in part because amount specified was not yet in dispute); *Santa Fe Eng'rs,* 991 F.2d at 1582 (holding contractor's cost proposal was not in dispute and, therefore, not a CDA "claim" while parties continued negotiations); *Heyl & Patterson, Inc. v. O'Keefe,* 986 F.2d 480, 485 (Fed.Cir.1993) (holding contractor submissions were not CDA claims where they suggested contractor and government were not in dispute but were still negotiating and where contractor had not requested a final decision).

Other cases only acknowledged *Dawco's* pre-existing dispute requirement but did not address whether the contractor's submission at issue satisfied that requirement: *Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1579 (Fed.Cir. 1992) (acknowledging a claim must be in dispute when submitted without citing *Dawco* ); and *Essex Electro Eng'rs,* 960 F.2d at 1582.

**11.** Congress delegated to OFPP the responsibility of implementing overall procurement policy for executive agencies in the Office of Federal Procurement Policy Act, 41 U.S.C. § 401 *et seq.* (1988 & Supp. V 1993). In *Essex Electro Engineers,* we held that the OFPP does have authority to issue regulations implementing the CDA, and that authority is broad enough to encompass regulations defining "claim." 960 F.2d at 1580.

**12.** Several commentators have criticized *Dawco* for misreading FAR § 33.201 and erroneously relying on *Mayfair. E.g.,* Val S. McWhorter & Carl T. Hahn, *Disputing the Meaning of a Claim: The Fallout from Dawco Construction,* 23 Pub. Cont.L.J. 451, 456 n. 3, 457 (1994). Other articles critical of *Dawco* 's rationale for requiring a pre-existing dispute include: Donald P. Arnavas, *To Claim or Not to Claim,* 8 Nash & Cibinic Rep. ¶ 63 (1994); Ralph C. Nash, Jr., *The Contract Disputes Act: No Claim, No Jurisdiction,* 5 Nash & Cibinic Rep. ¶ 66 (1991); and Neil H. O'Donnell, *A Process Gone Awry: The Increasing Procedural Requirements for Government Contracts Disputes,* 58 Fed.Cont.Rep. (BNA) 18 (1992).

only to contracts resulting from solicitations issued on or after June 1, 1980). Reflectone's contract resulted from a solicitation issued after that date. It had no such disputes clause in it.

Moreover, it does not appear that the drafters of FAR 33.201 intended it to include a comprehensive pre-existing dispute requirement. First, the 1979 interim regulatory definition of "claim" at issue in *Mayfair* was ultimately replaced with the current definition at issue here. If OFPP intended the current regulation to require that a non-routine payment demand be in dispute when submitted in order to be a "claim," the agency could have easily written the regulation to incorporate such a requirement, as had been done in the past. Indeed, it could have retained the above quoted language of paragraph 3 of the old, interim regulation. It did not do so. Rather, it adopted a single exclusion from what would otherwise be a "claim," for routine requests, and even then limited the exception to those routine requests not in dispute at the time of submission. *Cf. Trayco, Inc. v. United States,* 994 F.2d 832, 836 (Fed.Cir.1993) (if Congress had intended a particular meaning, it would have explicitly said so).

Secondly, a formal response by the OFPP's chief officer clearly indicated that the OFPP, when it drafted the current FAR language, did not view that language as always requiring a dispute, and furthermore, did not view a dispute requirement as a proper implementation of the CDA. During the process of revising the definition, Donald E. Sowle, Administrator of the OFPP, responded to a suggestion by the DAR (Defense Acquisition Regulation) Council that the revised version explicitly incorporate a dispute requirement by stating: "The proposed DAR coverage does not properly implement the Contract Disputes Act. The Act does not require that a claim be 'disputed by the other party,' nor does it require that a claim be submitted under the Disputes clause." 1981–1983 New Developments, Gov't Cont.Rep. (CCH) ¶ 92,682 (Jan. 28, 1983).

## C. The Effect Of Dawco's Holding That The FAR Always Requires A Dispute Is Contrary To The Goals Of The CDA

The *Dawco* dispute requirement has proven to be inimical to at least two goals of the CDA: providing for the efficient and fair resolution of contract claims. *See* Report of the Senate Governmental Affairs Committee and the Senate Judiciary Committee on the Contract Disputes Act of 1978, S.Rep. No. 1118, 95th Cong., 2d Sess. 4 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5238.

Even where the parties proceed in a shared belief that they are in dispute, and the CO issues a final decision on a contractor's claim, as happened here, the issue of whether the payment demand was actually in dispute when the purported claim was submitted can be raised anytime, before the Board or the Court of Federal Claims or on appeal to us. Since the court's ruling in *Dawco* in 1991, nearly two hundred Board, Court of Federal Claims, and Federal Circuit decisions have addressed whether a particular contractor's demand for payment was "in dispute" before it filed its claim, according to Donald P. Arnavas, *To Claim or Not to Claim,* 8 Nash & Cibinic Rep. ¶ 63 (1994). According to one Armed Services Board of Contract Appeals Judge, one-half of all cases considered by the agency boards that concerned *Dawco*'s dispute requirement resulted in dismissal for lack of jurisdiction. *Half of All Dawco Cases at Agency Boards Result in Dismissal,* 61 Fed.Cont.Rep. (BNA) 18 (1994).

These judicial inquiries into whether a dispute pre-dated a submission are at best an inefficient use of limited resources, given that before the Board or court reaches this question there will necessarily have been a final CO's decision denying the contractor's submission or at least a deemed denial based on the CO's failure to respond. Moreover, in each case, the government continues to dispute the claim, because otherwise it would have settled the matter and no appeal would be necessary. Because a dispute clearly exists at the time an appeal is dismissed for

lack of a dispute pre-dating submission of the demand for payment to the CO, after dismissal the contractor need only resubmit the identical demand to the CO. The resubmitted demand would now indisputably satisfy the pre-existing dispute requirement and, therefore, be a CDA claim. The process of final decision and appeal would begin all over again, but at great cost to the parties, the boards and the courts, and often with no benefit because the disputed issues on the merits have already been well defined by the course of litigation. Clearly, this repetitive and needlessly drawn-out process can hardly be said to promote the "efficient" resolution of claims.[13] Nor is it "fair." Requiring contractors to submit the identical claim twice, as the government would have them do, is a waste of the contractor's time and money. The taxpayers' money is likewise wasted when the agency boards or the Court of Federal Claims must hear the same case on two different occasions. Nor has the government shown how this process is not seriously inefficient, unfair and wasteful.

The government argues, however, that the dispute requirement is a proper judicial interpretation of a separate goal of the CDA: settlement of disputes at the administrative level, short of litigation. As explained in the Report of the Senate Governmental Affairs Committee and the Senate Judiciary Committee, "[t]he act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation...." S.Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5235.[14]

The government contends that the dispute requirement gives the CO more opportunity to request any additional information that the CO may need once a demand for payment has been submitted without creating a claim which necessitates a final decision. Once a contractor's submission is deemed a "claim," it triggers the CO's statutory duty to respond, within sixty days for claims under $100,000 and within a reasonable time for claims over that amount. 41 U.S.C.A § 605(c) (West Supp.1995). At oral argument, the government maintained that a CO would have insufficient time in which to request additional information and evaluate a claim once the statutory time frame for issuing a final decision was triggered. According to the government, the dispute requirement provides two advantages under its view of the statutory scheme. First, because the dispute requirement allows the CO to avoid creation of a CDA claim while requesting information, he will always have sufficient time to get and evaluate a fully documented claim. Secondly, by preventing contractors from withholding information in order to bypass negotiations and by allowing the CO a means of gathering sufficient information to evaluate the claim, the dispute requirement promotes negotiation and settlement.

The fact that a dispute requirement may be more convenient for the government does not allow us to read such a requirement into the CDA or the FAR where the plain language simply does not express it. If the dispute requirement is of vital importance to the government's negotiating position with contractors, the government's only option is to seek to change the FAR.

Furthermore, the government's rationale for requiring a dispute rings false, for the CO can always request more information even if a non-routine written demand for payment as a matter of right, whether or not disputed, were considered a claim when submitted. The contractor's submission of a claim does not prevent this, but simply starts the run-

---

**13.** To avoid needless and wasteful procedural litigation, the American Bar Association Section of Public Contract Law has called for the elimination of *Dawco*'s "dispute" requirement through amendment of the FAR. *ABA Section Renews Plea for Regulatory Fix to Dawco 'in Dispute' Requirement,* 60 Fed.Cont.Rep. (BNA) 9 (1993).

**14.** This policy is also articulated in FAR 33.204:

> The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim.

ning of the clock within which a CO must issue a final decision. For claims over $100,000, the absence of a dispute requirement should have very little impact on the CO. He would be quite "reasonable" in requesting additional information and delaying decision pending response to his request and, therefore, still be within the statutory time frame. For claims under $100,000, if the contractor has not proven entitlement to the claimed sum, as is its burden, the CO may have no choice but to deny the claim. *See Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991) ("To receive an equitable adjustment from the Government, a contractor must show three necessary elements— liability, causation, and resultant injury."). Alternatively, the CO may request more information and agree with the contractor to allow more time for final decision. FAR 33.211(c) (requiring final decision on claims under $50,000 within sixty days only when requested by contractor; otherwise decision must be rendered within a "reasonable time"); S.Rep. No. 1118, 95th Cong., 2d Sess. 21 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5255 (sixty-day period for final decision may be extended by written agreement between both parties).

But, the comprehensive dispute requirement the government advocates would allow it to continually, indeed endlessly, seek information and prolong negotiations without issuing an appealable decision merely by refusing to acknowledge a dispute, thereby probably delaying rather than accelerating any possible settlement. *See Saco Defense, Inc.,* ASBCA Nos. 44792, 45171, 93–3 BCA ¶ 26,029 at 129,387, 1993 WL 130175 (illustrating CO's refusal to act on contractor's submission). The government may have little incentive to settle until the contractor's submission becomes a claim and starts the clock for issuing a decision and, if the contractor ultimately prevails, for the accrual of interest. 41 U.S.C. § 611 (1988) ("Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim...."). A dispute requirement that allows the government to unilaterally designate when a submission becomes a "claim" disrupts the balance of power between the government and contractors that the CDA sought to establish. S.Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5235 ("The [CDA] provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims."). The purpose of awarding interest to contractors from the submission date of a successful claim is to compensate them for a legitimate cost incurred when required by the government to perform the additional work of a changed contract. *Id.* at 32, 1978 U.S.C.C.A.N. at 5266. Allowing the government to unilaterally determine a claim's submission date would vitiate this purpose.

Moreover, the *Dawco* dispute requirement can actually stifle a contractor's incentive to negotiate to settlement rather than pursue litigation, contrary to the goals of the CDA. Decisions following *Dawco* have held that until negotiations between the parties have reached an "impasse," no dispute exists, and, therefore, a submission to the CO pending review cannot be a "claim." *Santa Fe Eng'rs,* 991 F.2d at 1582 (holding contractor's cost proposal for proposed change order was not in dispute and, therefore, not a CDA "claim" while parties continued negotiations). As the Federal Circuit Bar Association argues in its amicus brief, contractors are therefore motivated to by-pass or cut short negotiations in an effort to create a dispute so they may proceed with their legal remedies. Indeed, one commentator counsels contractors to avoid asking the government to further consider negotiating a claim after the claim has been submitted for fear of not meeting the "impasse" requirement. Victor J. Zupa, *When is a Claim Not a Claim?,* 22 Pub.Cont.L.J. 654, 667 (1993). Judge Bennett warned against just this effect of the dispute requirement in *Mayfair* where he stated:

> Maintenance of a predispute posture should be encouraged, not penalized. Requiring a dispute before interest can ac-

crue pushes the parties that much closer to litigation and only serves to encourage 'creation' of a dispute in order to permit the payment of interest.

841 F.2d at 1582 (Bennett, J., dissenting). *See* Alan C. Brown, *The New Time Limits on Contract Claims Under the Federal Acquisition Streamlining Act of 1994,* 63 Fed. Cont.Rep. (BNA) 31, 39 (1995) (maintaining dispute requirement is inconsistent with Congress' intent to encourage settlement).

Finally, as we previously noted, "[t]here is no necessary inconsistency between the existence of a valid CDA claim and an expressed desire to continue to mutually work toward a claim's resolution." *Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1579 (Fed.Cir.1992). The parties are not prevented or discouraged from settling their differences because the first written demand for payment as a matter of right that is not merely a routine request for payment is recognized and treated as a CDA "claim." If anything, such a rule promotes settlement by preventing procrastination.

## II.

Because we hold that a "claim" under FAR 33.201, and hence under the CDA, does not ordinarily require a pre-existing dispute, the second question on which we requested in banc briefing, whether that pre-existing "dispute [must] also be as to amount, or is denial of liability sufficient," is prudentially moot and we need not and do not address it.[15]

Similarly, because we hold that Reflectone's REA is a claim as defined in the FAR, we do not address whether failure to satisfy that definition creates a jurisdictional defect

**15.** The second question posed reads: "If a 'claim' requires a pre-existing dispute, and the claim seeks, 'as a matter of right, the payment of money in a sum certain,' must that dispute also be as to amount, or is denial of liability sufficient?"

**16.** The third question posed reads:
Does a contractor's failure to comply with a provision of the Contract Disputes Act (CDA) or the FAR, relating to submission of a claim

since we are not required to answer that question to dispose of this appeal.[16]

Moreover, we neither decide nor comment on the issue of whether any *other* FAR requirement, such as the one for certification discussed in *United States v. Grumman Aerospace Corp.,* 927 F.2d 575 (Fed.Cir.), cert. denied, 502 U.S. 919, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991), is jurisdictional as it is not presented by this case. *See Keene Corp. v. United States,* —— U.S. ——, ——, 113 S.Ct. 2035, 2044-45, 124 L.Ed.2d 118 (1993). Nor do we intimate any view on how an *in banc* court might decide such questions if properly presented. In any event, such questions might not be amenable to a simple "yes" or "no" answer. The effect, purpose and statutory basis for each individual regulatory requirement might have to be examined before determining whether it is jurisdictional.

## CONCLUSION

We hold that properly construed for its plain meaning, the language of FAR 33.201 does not require that a payment demand contained in a purported CDA claim be in dispute before being submitted for decision to the CO unless that demand is a "voucher, invoice or other routine request for payment." To the extent that *Dawco* and cases relying on *Dawco* can be read to suggest otherwise, they are overruled. We further hold that Reflectone's REA satisfies the definition of "claim," and, therefore, we reverse the Board's dismissal for lack of jurisdiction and remand this case to the Board for further proceedings on Reflectone's appeal consistent with this opinion.[17]

### *REVERSED AND REMANDED*

### COSTS

Each party to bear its own costs.

to the Contracting Officer, deprive a reviewing forum of subject matter jurisdiction over a challenge to the Contracting Officer's decision on the claim, or does noncompliance merely raise the defense that the contractor has failed to state a claim under the CDA upon which relief may be granted?

**17.** We, or course, take no position on whether there is any merit to Reflectone's appeal.

NIES, Circuit Judge, concurring.

I concur in holding that the Armed Services Board of Contract Appeals has jurisdiction in this case. I conclude that there is no requirement for a preexisting dispute as to the *amount* of a demand for an equitable adjustment where the government has denied *any* liability. This conclusion is sufficient to dispose of this appeal and I would reverse and remand for this reason.