**RCS ENTERPRISES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–156C.**

United States Court of Federal Claims.

June 8, 2004.

David Hollar, Denver, CO, for plaintiff. William E. Myrick, William E. Myrick & Associates, of counsel.

Matthew P. Reed, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Major Samuel W. Morris, U.S. Army Litigation Division, Arlington, VA, of counsel.

### OPINION

CHRISTINE O.C. MILLER, Judge.

This case is before the court after trial on plaintiff's claim that the Government appropriated various value engineering change proposals without compensation in breach of the parties' contract. Plaintiff is a telephone

billing auditor that entered into a contract with the U.S. Army to review billing records and recommend telephone savings. Over the past three years, defendant has winnowed plaintiff's claims to the one count of the complaint that survived for trial. Trial provided a context that dispositive motions could not furnish. The result is that the contractor may have been treated poorly and unprofessionally, but establishing a predicate for liability has proved elusive.

## FACTS

The parties proceeded to trial after three dispositive motions filed by the Government, which enabled the court to make partial findings pursuant to RCFC 56(d).[1] *See RCS Enters. v. United States,* 57 Fed.Cl. 590 (2003) (*"RCS III"*); *RCS Enters. v. United States,* 53 Fed.Cl. 303 (2002) (*"RCS II"*); *RCS Enters. v. United States,* 46 Fed.Cl. 509 (2000) (*"RCS I"*).

In *RCS I* this court dismissed both counts of plaintiff's complaint. Count I sought a percentage of past overbillings, complaining that government personnel prevented plaintiff from securing refunds from the telephone companies. This court dismissed, in part, because plaintiff failed to comply with the contract requirement to seek reimbursement from the companies as a prerequisite to sharing in any recovery. 46 Fed.Cl. at 514. Plaintiff also complained in Count I that government personnel interfered in other ways with its performance under the contract, but those claims were dismissed either because plaintiff failed to comply with the Contracts Dispute Act, 41 U.S.C. § 605(a) (2000), which requires a final decision on the claim by the contracting officer, or because plaintiff did not identify any costs. *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed. Cir.1995) (en banc) (requiring claim to assert payment of money in sum certain). The court dismissed Count II of plaintiff's complaint, holding valid the contract provision that barred an appeal of the contracting officer's decision to reject suggested Value Engineering Change Proposals ("VECPs").[2] *RCS I,* 46 Fed.Cl. at 517–18.

After the plaintiff's first complaint was dismissed in *RCS I,* plaintiff initiated a new action. Its complaint filed on March 20, 2001, consisted of seven counts.[3] Defendant moved for summary judgment on the second complaint. In *RCS II* this court dismissed Counts I and II, as well as Counts III and IV insofar as they sought a share of refunds for past overbillings. 53 Fed.Cl. at 306. Claim preclusion foreclosed these claims, because *RCS I* had resolved them in defendant's favor. *Id.* at 307–08. The court denied summary judgment to the extent that disputed genuine issues of material fact remained as to plaintiff's claim to a share of identified future savings, Counts V though VII. *Id.* at 309.

Defendant's third dispositive motion addressed the First Amended Complaint filed on October 29, 2002. Counts I and II of the First Amended Complaint, alleging breach of contract by failure of the Government to provide access to invoices and personnel, as well as breach of a duty to assist plaintiff in obtaining available refunds and credits, were barred by issue preclusion and therefore dismissed. *RCS III,* 57 Fed.Cl. at 593. *RCS II* had explained that plaintiff pleaded that government personnel prevented it from identifying total refunds due in connection with past overbillings. *See* 53 Fed.Cl. at 308. Count III also was dismissed because it pertained to past refunds alone, the subject of the court's dismissal in *RCS II. Id.* Counts V, VI, and VII similarly were dismissed because they concerned government hindrance of contract performance, a claim that was barred by the court in *RCS I. Id.* at 596.

---

1. The facts found at trial supercede any facts set forth in prior opinions and orders of this court.

2. This ruling did not preclude plaintiff from claiming, as it does in the present case, damages for rejected VECPs, if, despite formal rejection under the contract, the Government implemented, and benefitted from, the cost savings proposals.

3. After plaintiff's entire complaint was dismissed in *RCS I,* plaintiff resubmitted its claim to the contracting officer on September 22, 2000. On February 8, 2001, plaintiff received the contracting officer's denial and filed its first complaint in the present action on March 20, 2001.

Count IV, which made a claim for damages triggered by plaintiff's submission of VECPs, survived the third dispositive motion. Defendant sought to dismiss Count IV, alleging it violated the Anti–Deficiency Act, 31 U.S.C. § 1341 (2000) (the "ADA"), by holding the Government liable in excess of the amount appropriated by Congress. The amount, if any, of damages due plaintiff remained in dispute because reformation was held to be the proper remedy to a contract clause that violated the ADA, and defendant's potential liability was limited to one year of shared savings. *Id.* at 595–96. Defendant also sought summary judgment against plaintiff for a prior material breach, alleging that plaintiff violated the cost-sharing requirement of the Small Business Administration's ("the SBA") 8(a) program. *See* 48 C.F.R. (FAR) § 52.219–14 (2003). The court denied summary judgment due to the existence of factual disputes. *Id.* at 597. Thus, two issues remained for trial: whether plaintiff was due payment under the contract for submitting VECPs and whether plaintiff's teaming arrangement violated the statutory requirements for SBA contracts. *See* 15 U.S.C. § 637(a) (2000). The facts recited below have been found after trial.

RCS Enterprises ("plaintiff"), which provides telecommunications auditing and consulting services, was founded by Russ C. Simpson in 1991. Based in Denver, Colorado, plaintiff audits telephone and utility bills for overcharges, errors, and potential savings. Plaintiff has performed over 700 audits for various clients and is certified by the SBA as an 8(a) contractor. At the time relevant to this proceeding, plaintiff had two employees, Mr. Simpson and his wife.

On August 13, 1997, plaintiff presented Angela F. Coats, Contracting Officer for the U.S. Army Signal Command ("the ASC") at Fort Hauchuca, Arizona, with an unsolicited proposal to audit select Army telecommunications systems. Plaintiff proposed that it would team with Accu–Rate, an El Paso, Texas-based bill auditor, to audit local and long distance telephone bills with the dual objectives of identifying overcharges and potential savings.

The subject of plaintiff's proposal was White Sands Missile Range ("WSMR"), the largest land mass facility in the United States, located in a remote section of south central New Mexico. WSMR is used to research, develop, test, and evaluate military hardware, as well as to support large-scale military exercises. WSMR is several hundred miles away from Ft. Hauchuca, which is the location of the ASC, and specifically the Army Telecommunications Office (the "ATO"), which controls all Army telecommunications systems, including those at WSMR.

Plaintiff's audit proposal was not entirely gratuitous, in that it was referred to the ASC by WSMR's Small Business Advocate, Luis Sosa. Mr. Sosa arranged a meeting in early 1997 between Jeffery Barber of Accu–Rate and Clyde E. Meador, Telecommunications Coordination Officer at WSMR. During this meeting Mr. Barber discussed an audit of telephone bills. Following the discussion with Mr. Meador, plaintiff and Accu–Rate formed a team and made a formal telecommunications system audit proposal to Ms. Coats at the ASC.

The contract, drafted by Ms. Coats at Ft. Hauchuca, covered an audit of the telecommunications system at WSMR. The prime contractor was the SBA, which, in turn, subcontracted the audit to plaintiff. The contract provided that, if plaintiff identified any overcharges that resulted in credits or future savings during the course of the audit, plaintiff would receive one half of the amount recovered. Accu–Rate, which was located closer to the WSMR telecommunications office, was to do the on-site work of gathering telephone bills and records. Plaintiff was to analyze the bills and records, identifying overcharges. If any savings or credits were secured due to the audit, plaintiff and Accu–Rate were to divide evenly the one half recovered under the contract.

Ms. Coats awarded plaintiff a contract on January 9, 1998, signed by plaintiff on January 13, 1998, that incorporated by reference plaintiff's proposal for a telecommunications audit. Per the contract plaintiff was to conduct a telephone bill audit for WSMR and its associated sites. WSMR's sprawling 40–mile by 100–mile facility in New Mexico has a

telecommunications system that ties into both New Mexico and Texas area codes. The audit recited its purpose to "ensure that various service providers are not overcharging for such items as rates, phone lines, cable, and equipment as per the associated tariffs." Telephone Audit Contract, January 13, 1998, § B.1. In addition, plaintiff was to review WSMR procedures for waste, fraud, and abuse.

Plaintiff was to be paid $150.00 for a demonstration at the post-award conference, after which it would receive 50% of any credits and savings secured by the Government, as well as an option to receive further credits and saving for two following fiscal years. However, "[i]f there is no credit or savings due to the elimination of incorrect billings and/or overcharges, there is no savings share due to RCS Enterprises by the Government." Telephone Audit Contract, § B.3.

The contract contemplated that plaintiff would perform the audit by collecting all of WSMR's telephone bills for the three months prior to the audit and requesting its customer service record from each of the client's telephone service providers. To facilitate the review of WSMR's bills, plaintiff submitted its Telecommunications Information questionnaire, which detailed the service providers, accounts, and hardware used by WSMR. A post-award conference was held on January 28, 1998 at which Ms. Coats provided plaintiff with the completed questionnaire.

Along with the completed questionnaire, WSMR also gave plaintiff a schematic diagram of the WSMR telecommunications system, as well as a list of WSMR's Commercial Service Authorizations ("CSAs"). A CSA is a binding contract between the Government and a vendor for a telecommunications circuit that directs telephone calls to an account with an outside long-distance provider.

Plaintiff learned at the post-award conference that WSMR operated two classes of telephone service: mission-related and residential. Mission-related telephone lines are for official Army business. Because of its remote location, the Army also provides residential service for soldiers and contractors who reside within the sprawling WSMR. These customers are assigned residential service for their personal use. For residential customers WSMR provides telephone service and acts as the customers' local telephone company. When bills come in for these telephone lines, WSMR determines the charges due to each customer and bills the customer individually for their telephone usage.

At the post-award conference, Ada M. Veney, Telecommunications Specialist at Ft. Huachuca who served as technical advisor to the contracting officer, inserted check-marks beside the CSAs that were mission-related and were to be audited by plaintiff. Of the 21 CSAs listed, 18 had check-marks. The remaining three CSAs had the word "no" written beside them, and Ms. Veney told Mr. Simpson not to audit them because they were residential.

Other than the three CSAs marked "no," Mr. Simpson was not told of anything else that was excluded from the audit. Ms. Coats informed ASC personnel in a November 19, 1997 e-mail that they were "required to provide a list, prior to [plaintiff's] audit, that spells out what the Government is considering already." Savings and credits already considered by ASC would be eliminated from the possible recovery shared with plaintiff. Plaintiff was not informed of any changes to the telecommunications system that were already being considered by ASC or WSMR. The list of CSAs with check-marks was the only document provided to plaintiff giving guidance on what was and was not to be audited.

After the post-award conference, Mr. Barber requested WSMR's bills from Mr. Meador, who was the technical contact for the contract. The personnel involved in drafting and negotiating the contract were stationed at ASC at Ft. Hauchuca, whereas Mr. Meador was stationed at WSMR itself. During this period plaintiff met with resistance from WSMR personnel with respect to providing copies of bills and information on telecommunications lines used for official business. Despite these obstacles, some of which plaintiff attributes to WSMR personnel and which are beyond the scope of this proceeding, *see RCS II,* 53 Fed.Cl. at 308–09, plaintiff submitted

its report to the ATO during a meeting at Ft. Hauchuca on July 10, 1998. Attending Mr. Simpson's presentation were Mr. Barber; Calvin Knight, ATO Supervisor; Katrina Ramirez, Director of the ATO; and Major Jerome Miles, who had replaced Ms. Coats as Contracting Officer. Plaintiff's report and recommendations were received enthusiastically, and Ms. Ramirez requested that plaintiff make a similar presentation to the personnel at WSMR.

Mr. Barber, who was based in El Paso and thus closer to WSMR, made the second presentation of the report; plaintiff's conclusions and recommendations were rejected. Plaintiff sought a written decision from Major Miles regarding his reasons for the rejection. As an apparently unrelated response, Major Miles requested that plaintiff complete a traffic study on the use of a Southwestern Bell switch, the computer that routes incoming and outgoing telephone calls. However, even after performing the additional traffic study, plaintiff never received a written response from Major Miles regarding the rejection of plaintiff's audit. Plaintiff attempted to pursue the unresolved issues with telephone calls and letters to Army officials, WSMR personnel, and even members of Congress. None of these efforts generated a written statement of reasons for the rejection of plaintiff's audit.

In response to the rejection of the audit and lack of justification, plaintiff filed a Contracts Disputes Act claim pursuant to the Federal Acquisition Act on November 20, 1998. FAR § 52.233–1 (2003). Major Miles responded to plaintiff's claim by letter dated January 22, 1999, which set forth his reasons for rejecting plaintiff's audit. Plaintiff appealed, and Major Miles' rejection was incorporated by reference into a final decision letter by Contracting Officer Duane M. Markham dated December 26, 2000.

Mr. Meador was the principal witness for both plaintiff, adversely, and defendant, who testified at trial about the scope of the audit, plaintiff's recommendations, and the reasons why plaintiff was not entitled to cost savings for any recommendations. Basically, he eschewed the notion that plaintiff offered any new information that WSMR had not identi-

fied and addressed prior to the audit, and in some instances he testified that the information was mistaken. The court found Mr. Meador to be a highly competent, informed technician, who viewed the audit as a validation of his operation. The testimony fairly supports an inference that he would not have requested the audit and that he only tolerated it as an SBA initiative.

### 1. *Late fees*

Plaintiff's audit revealed that WSMR routinely was assessed late fees which it paid to Southwestern Bell and U.S. West, both telecommunications service providers. U.S. West late charges were found to be $54.27 a month, an annual cost to WSMR of $651.24. Plaintiff recommended that WSMR review past late fees to ensure they were not paid in error, that WSMR in the future not pay late fees until verified, and that WSMR verify payments as late by reconciling the due date with the date on which the service provider cashes the payment check.

When a utility company assesses a fee for late payment, the fee amount, generally a percentage of the bill, is found in the utility company's tariff. A tariff is a set of documents filed with an applicable regulatory agency that discloses all the fees and rates that a utility company may impose on consumers.

Prior to the audit, Mr. Meador reviewed WSMR's bills for erroneous late charges and would obtain a credit if warranted, but WSMR paid late charges when rightfully assessed. Once a bill was received at WSMR's telecommunications office, Mr. Meador testified that he would review it and submit a voucher to a the Defense Finance and Accounting Service ("DFAS"), the Department of Defense organization responsible for managing funding. DFAS, which is located in Rock Island, Illinois, would process the voucher and produce a check to pay the bill. The time necessary to process payments through this system resulted in late charges.

WSMR did not incur late charges from May 1997 through January 1998. November 1997, December 1997, and January 1998 were the three billing months that were the focus

of plaintiff's audit. Despite plaintiff's recommendation, after the audit WSMR never refused to pay an assessed late charge and continued to employ the same bill paying procedure.

### 2. *Charges for 900–numbers, 800–numbers and collect calls*

During its audit plaintiff found that WSMR was spending $348.50 a month, $4,182.00 annually, on 900–number calls to psychic and pornographic services. After learning of the 900–number calls and informing Ms. Coats, Mr. Simpson was advised that the calls should not appear on the bills and to include this information in his report. The court credits Mr. Simpson fully that he received this instruction, which proved to be based on Ms. Coats's poor understanding of how WSMR insulated itself from prohibited calls. Mr. Meador was not credible insofar as his opinion of the restricted scope of the audit, whereas Ms. Veney, called as an adverse witness by plaintiff, was wholly credible that plaintiff was tasked "to review internal government procedures to control waste, fraud and abuse." Transcript of Proceedings, *RCS Enters. v. United States,* No. 01–156C, at 331 (Fed.Cl. Feb. 10–12, 2004) ("Tr.").

Although Mr. Meador testified that WSMR is reimbursed for the toll charge when the customer pays his bill, plaintiff was not aware that some of the CSAs that it was auditing contained both residential and business telephone lines. Thus, plaintiff reasonably identified what it believed to be improper 900–number calls, which, in fact, were placed by residential customers who would reimburse WSMR. Plaintiff's confusion was the result of improper labeling and misidentification, which led plaintiff to believe that some CSAs were business only, when, in fact, they contained both business-related and residential telephone lines. As Mr. Meador testified from reviewing the telephone billing records at the time, plaintiff would not have been able to ascertain whether lines were business or residential.

Ultimately, plaintiff recommended placing a 900–number block, thus saving WSMR these charges. Abel R. Brietha, Switch Engineer at WSMR, testified that the 900–number calls already were blocked on all business-related telephones prior to plaintiff's audit. If any witness manifested the certitude that equates to competence, it was this calm, assured individual.

Plaintiff similarly identified charges of $133.53 a month, $1,602.36 annually, for long-distance calls placed through an 800–number service. Plaintiff investigated these charges and determined that they stemmed from an individual at WSMR who sold a long distance service that is accessed, and charged, by calling an 800–number. Plaintiff recommended blocking these calls and requiring personnel to use only Army-provided long distance service. As with the 900–numbers, even though these calls were placed through a CSA that plaintiff was instructed to audit as a business line, the Government showed that these calls were from residential customers.

Plaintiff also discovered during its audit that WSMR routinely accepted collect calls that cost an average of $1,903.62 a month, $22,843.44 a year. To curtail collect call expenses, plaintiff recommended that WSMR establish an 800–number via FTS2000, the Government's discounted long-distance account, and have all mission-related long distance calls placed to that 800–number instead of accepting collect calls. Plaintiff further recommended that WSMR stop accepting collect calls on business lines.

Regarding plaintiff's recommendations on collect calls, 900–number calls, and 800–number long distance charges, Mr. Meador testified that these were residential charges and that WSMR was reimbursed. However, Ms. Coats included these charges in the list of CSAs that plaintiff should audit as mission-related. Because the WSMR telecommunications office is responsible for both mission-related telephone lines, as well as residential service for employees and contractors, some CSAs contain both mission-related and residential accounts.

When a mission-related telephone line is installed at WSMR, a pre-determined set of conditions is installed on the line at the switch, including a block on all 900–number

calls. The switch is the large computer that controls all telephone lines coming out of and going into WSMR—in this case a Nortel model SL 100 with the ability to handle 23,000 lines. Therefore even prior to plaintiff's audit, a 900–number call could not be placed from a business line. WSMR operated its own switch; therefore, if a 900–number block was added after the audit, it would not require a change to the CSA.

During the course of the audit, after plaintiff informed WSMR personal of the potential 900–number problem, Mr. Brietha testified that he examined the switch records for the previous 60 days and determined that all 900–number calls came from residential lines, except for two calls to Microsoft Corporation Technical Support and likely routed through a WSMR operator. For each monthly billing cycle, Mr. Meador would order magnetic computer tape containing all of the call details from the outside telephone companies. This information was used to ensure that all 900–number and collect calls were paid for by the appropriate residential customer. Mr. Meador confirmed that WSMR was reimbursed by residential customers for the full amount of incurred residential charges, both before and after plaintiff's audit.

Unlike 900–number calls, the WSMR switch did not block mission-related lines from accepting collect calls. While most Army lines did not accept collect calls, given the diverse geographic spread of WSMR, the practice at WSMR was to not block collect calls on business lines. Mr. Meador testified that the policy in place at WSMR was that only a supervisor or duty staff officer could accept collect calls, but admitted that there was no practicable means of enforcing that policy. In effect, WSMR employed an "honor system" for collect calls using official telephone lines; although the policy may result in unnecessary or additional costs, the policy was not changed in accordance with plaintiff's recommendation.

### 3. *Long-distance charges*

During its review plaintiff found that one account, 505–434–6165, was billed long distance at an expensive residential rate, rather than the pre-negotiated FTS2000 Government rate. Changing long-distance service on this account to FTS2000 would save WSMR $140.64 a month, $1,687.68 annually. When plaintiff submitted this recommendation, Ms. Coats wrote "Good Recommendation" beside it. The contracting officer ultimately rejected this recommendation. Even though WSMR personnel do use that telephone on occasion, Mr. Meador established that it is installed at the Apache Point Observatory in Sunspot, New Mexico, and generally is used by a non-government entity that reimburses WSMR for its use.

Account number 505–434–6165 is billed pursuant to CSA DAEA 32–95–MS–7100. DAEA 32–95–MS–7100 was listed in an attachment to plaintiff's contract with ASC, next to which appeared a check mark indicating that plaintiff was instructed during the post-award conference to audit this CSA as mission-related. It was only after plaintiff audited the CSA, uncovered unnecessary expenses, and made recommendations for savings, that plaintiff was informed that the CSA is not mission-related and should not have been audited.

### 4. *Direct inward dial numbers*

Direct inward dial ("DID") numbers differ from regular telephone lines. Rather than having each designated telephone number assigned its own line, an organization can purchase DID numbers which allow numerous distinct telephone numbers to be used by the organization without the necessity of each user being issued an individual telephone line, resulting in several telephone numbers routing through a single line. For each telephone line that an organization purchases, a large number of DID numbers may be used. During the course of the initial audit, plaintiff discovered that WSMR pays for 20,000 DID numbers from U.S. West and 14,100 DID numbers from Southwestern Bell. The 20,000 U.S. West DID numbers represented all telephone numbers with the 678– and 679–prefixes in the New Mexico area code of 505. WSMR also paid Southwestern Bell for the rights to 14,100 overlapping numbers in 915 Texas area code, which represented all of the 679–prefix numbers and the later 4,000 of the 678–prefix numbers.

Plaintiff's initial report indicated that only 10% of the U.S. West 505 numbers were in use and recommended that WSMR retain 4,000 numbers and release the remaining 16,000 numbers to U.S. West, to generate savings of $4,328.70 a month, or $51,944.40 a year. For the Southwestern Bell 915 area code numbers, plaintiff was unsure whether the duplicate area code was necessary and recommended that WSMR eliminate the duplicate numbers. If deemed necessary by WSMR, plaintiff alternatively recommended that the 505 area code numbers be reduced to the same number of 915 area code numbers, saving WSMR $1,468.50 a month, $17,622.00 a year.

These duplicate DID numbers were the subject of the traffic study requested by Major Miles and submitted by plaintiff on September 17, 1998. In the traffic study, plaintiff confirmed that the duplicate 14,000 915 area code numbers purchased from Southwestern Bell were unnecessary due to the impact of the North American Numbering Plan (the "NANP"). The NANP allows a telecommunications system to designate a geographically diverse local calling area, so that, even though a call may be to an adjoining area, it will be treated as a local call. Mr. Meador reported to plaintiff that WSMR spans two area codes; to enable users within WSMR to telephone each other without making a long-distance call, the telecommunications system must utilize reserved numbers for both area codes. Mr. Simpson challenged Mr. Meador's assertion. According to Mr. Simpson, the NANP negated the necessity of duplicate numbers in adjoining area codes, so plaintiff had recommended that WSMR delete the Southwestern Bell numbers, with potential savings of $2,041.30 a month, or $24,495.60 a year. In addition to recommending a reduction in DID numbers, plaintiff identified an overbilling for two blocks of numbers that would result in a one-time credit of $2,937.00.

Mr. Meador clarified at trial that WSMR uses 15,000 of the 20,000 lines and an additional 2,000 are suspended at all times because of the constant change in numbers as residents and projects enter and leave WSMR. Plaintiff's recommendation regarding the Southwestern Bell DID numbers was also rejected because, according to Mr. Meador, WSMR had a need to allow local calling within the 505 area code. Furthermore, Major Miles informed plaintiff that WSMR had requested and received a proposal from Southwestern Bell on May 14, 1998, to reduce its trunks from 63 to 48.

A trunk is a T-1 circuit, which includes 24 circuits through which calls are placed into and out of the telecommunications system. Trunks connect the WSMR switch with commercial lines, effectively acting as WSMR's connection to local and long-distance lines outside of WSMR. Plaintiff commenced its audit on January 9, 1998, and was not informed before that date that WSMR was considering reducing its Southwestern Bell trunks.

Major Miles did not discuss the $2,937.00 overbilling in his January 22, 1999 decision letter. The proposed credit was addressed by Mr. Markham in his December 26, 2000 decision:

> The Government has not received a credit or refund for any item listed in Table I because no refunds or credit were due with the possible exception of an over billing in the amount of $2,937.00. However, RCS did not even attempt to validate or secure a refund from the contractor.

Mr. Simpson testified that the period of double-billing started July 7, 1989, and continued into 1991. WSMR may have obtained a credit for the period of over-billing, but Mr. Meador credits WSMR's own actions, not plaintiff's audit.

In order to reduce or add DID numbers, the ASC must execute a new CSA signed by a contracting officer. Ms. Veney reviewed WSMR's CSAs in March 2002 and concluded that none of plaintiff's recommended changes to the CSAs had been made. Mr. Brietha testified that he maintained and operated the switch at WSMR from 1984 until January 2004, and at no time did he notice a reduction of DID numbers. Ms. Veney's superiors, Mr. Knight and Ms. Ramirez, had agreed with plaintiff's recommendations. Ms. Veney herself sent an e-mail on January 29, 1999, to ASC's Inspector General noting that plaintiff had identified "possible savings" from,

among other things, a reduction in DID numbers.

Despite the initial acceptance of the recommendation, WSMR never reduced the its DID numbers.

Following the audit, plaintiff received neither a percentage of the cost savings identified in its report nor a percentage of the refunds or credits identified. Moreover, plaintiff was never paid the $150.00 for its demonstration at the post-award conference.

## DISCUSSION

1. *Whether the Government implemented plaintiff's recommendations*

■ During this court's previous rulings on dispositive motions, all issues of law were resolved, leaving only an inquiry as to whether plaintiff may recover under the terms of its contract with ASC. In order to recover under Count IV of its First Amended Complaint filed October 29, 2002, plaintiff must show that it recommended future cost savings that were implemented at WSMR despite their formal rejection. Plaintiff presented evidence of recommendations in six areas; late fees, 900–number calls, 800–number calls, collect calls, long distance charges, and DID numbers. It is plaintiff's burden to show that WSMR implemented these recommendations and that savings were realized.

Late fees were paid by WSMR with some regularity prior to the audit. However, plaintiff recommended verifying late fees before paying, not changing the procedure to avoid incurring them. No showing was made that WSMR implemented plaintiff's suggestion regarding late fees. Nor did plaintiff show that, even if WSMR had implemented its recommendation, any reduction in the frequency or amount of late fees would result.

To prevent 900–number charges, plaintiff suggested placing a block on all official telephone lines. However, unknown to plaintiff, the 900–number charges reviewed were from a CSA that contained both official lines and residential lines. WSMR blocked 900–number calls from official lines prior to the audit and was reimbursed for 900–number charges incurred by residential customers. Plaintiff's recommendation therefore was not imple-

mented, given that it was a procedure already undertaken by WSMR. No cost savings resulted from this recommendation. The same holds true for plaintiff's recommendation on 800–number long distance charges. These charges could not be made on official lines prior to the audit, but they were allowed on residential lines, for which WSMR is reimbursed by the customer. The situation was the same after the audit.

Unlike most military facilities, WSMR allows collect calls on official business telephone lines. Plaintiff suggested that WSMR discontinue this practice and warned that the "honor system" of only accepting official business collect calls was open to fraud. Despite these reasonable recommendations, WSMR continued to allow collect calls on official lines after the audit in order to permit soldiers to make contact with their superiors over the extensive geographical distances that WSMR operations span. Plaintiff's recommendation was not implemented, and no savings resulted.

Long-distance service was another area where plaintiff recommended cost savings. However, the line on which plaintiff recommended using government-rate long distance is one that is also used by non-government entities. Given its use, the more cost effective long-distance plan was not feasible, and therefore the recommendation was not implemented, and no cost savings were achieved.

Plaintiff's final recommendation concerned the reservation of large blocks of DID numbers. During its audit plaintiff discovered that the majority of these numbers went unused and recommended that WSMR no longer pay for reserving them. ASC and WSMR disputed that the majority of numbers were unused and countered that they must be reserved. While the evidence as to the merits of plaintiff's suggestion and any potential cost savings was not conclusive, the evidence was unequivocal that no change was made to the CSAs and that WSMR did not reduce its DID numbers. The recommendation was not implemented, so plaintiff is not entitled to a recover for savings not realized.

2. *Whether plaintiff committed prior material breach of the contract*

██ Defendant counterclaims that plaintiff committed a prior breach of its contract through its teaming arrangement with Accu–Rate. The gravamen of defendant's claim is that plaintiff subcontracted to Accu–Rate more than 50% of the contract work, in violation of FAR § 52.219–14 (2003), which provides: "At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern."

To fulfill the contract, plaintiff teamed with Accu–Rate and agreed to split 50% percent of any recoveries. By the terms of the agreement, Accu–Rate would not receive more than 50% of the cost of the contract, and thus the arrangement could not violate FAR § 52.219–14. While Mr. Simpson impressed the court as a sincere individual who was endeavoring to provide a valuable service to a recalcitrant client, the structure of his operation was not elaborate. Defendant's effort to pierce the teaming relationship is without merit.

3. *Demonstration fee*

██ The contract stated that plaintiff would be paid $150.00 for a technical demonstration. Although plaintiff completed the technical demonstration at the post-award conference, the $150.00 was never remitted to plaintiff. At the conclusion of trial, defendant's client representative indicated that this incidental payment would be handled dehors litigation, but the court has not been notified to that effect. Therefore, judgment in that amount will enter for plaintiff.

It was apparent that Mr. Meador did not support the contract-in concept, as well as execution. He told Mr. Barber when first presented with the audit proposal, "I'm not sure that I really need this kind of service myself." Tr. at 424. Indeed, he viewed the audit results as confirming the soundness of his operation: "It's the kind of thing that if you're comfortable that you're running a good system, you don't mind somebody coming in and looking at it and reinforcing that, giving you an idea that, hey, yeah, you're doing a good job." Tr. at 424–25.

The aegis for the audit was not a perceived necessity; rather, the SBA Advocate, Mr. Sosa, viewed this project as an appropriate SBA contractor opportunity. In short, WSMR did not want the audit and did not benefit from it in any way that obligated it to remunerate plaintiff. The court acknowledges Mr. Simpson's professionalism in addressing his assignment. However, because issues of performance were removed from the proceeding by defendant's serial dispositive motions-as to which defendant prevailed legitimately, if not with the undue persistence that only a well-funded party can demonstrate-the court makes no findings as to how Messrs. Simpson and Barber, on the one hand, and WSMR personnel, on the other, discharged their responsibilities under the agreement. Trial thus did not include issues related to allegations that WSMR personnel impeded the audit or otherwise frustrated plaintiff's performance. Because of the inept directions given to plaintiff and because WSMR either resolved the problems that were the subjects of Mr. Simpson's recommendations before the audit or determined that it would not change its policies because they were lawful and adequate, plaintiff's work was either redundant or irrelevant. The contract does not call for payment in these circumstances.

## CONCLUSION

Plaintiff has not shown by a preponderance of evidence that it is entitled to recover for VECPs, but is due the contract fee for the technical demonstration at the post-award conference. Accordingly,

**IT IS ORDERED,** as follows:

1. The Clerk of the Court shall enter judgment for plaintiff in the amount of $150.00, with interest pursuant to 41 U.S.C. § 611, from November 20, 1998.

2. The Clerk of the Court shall enter judgment for defendant on plaintiff's claims in Count IV regarding payment for VECPs, as well as judgment consistent with the orders entered on August 22, 2002, and August 6, 2003,

**810**

(1) granting summary judgment for defendant on Counts I and II of the Complaint filed March 20, 2001, and partial summary judgment on Counts III and IV insofar as they seek damages calculated as a commission on refunds.

(2) awarding summary judgment for defendant on Counts I through III and V through VII of the First Amended Complaint filed October 29, 2002.

No costs.