ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Al Muamroon Trading | )  ASBCA No. 63648 |
| | ) |
| Under Contract No. W912D2-22-P-0105 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. Durar Al Qudsi Ghalib Kamil
                                 Owner


APPEARANCES FOR THE GOVERNMENT:  Dana J. Chase, Esq.
                                   Army Chief Trial Attorney
                                 CPT Sana H. Daniell, JA
                                   Trial Attorney


OPINION BY ADMINISTRATIVE JUDGE SWEET
PURSUANT TO BOARD RULE 11


This appeal involves a contract for *pro se* appellant Al Muamroon Trading (Al Muamroon) to provide heavy material handling equipment to the government in the Kingdom of Saudi Arabia. The government terminated the contract for convenience, and made a settlement determination, which Al Muamroon appeals. The parties have elected to proceed under Board Rule 11. Al Muamroon argues that the government terminated the contract for convenience in bad faith (Bad Faith Termination Claim), and that the government's settlement determination was improper (Settlement Amount Claim) (app. br. 6-7).[1] As discussed below, we do not possess jurisdiction over Al Muamroon's Bad Faith Termination Claim (BFTC), so that claim is dismissed without prejudice. While we possess jurisdiction over Al Muamroon's Settlement Amount Claim, that claim is meritless. Thus, we deny the appeal on that ground.


FINDINGS OF FACT


I.    The Contract and the Termination for Convenience

1. On September 12, 2022, the 408th Contracting Support Brigade, Regional Contracting Center-Kuwait, Theater Contracting Center-Southwest Asia (government)

---

[1] In the issues presented section of its brief, Al Muamroon lists numerous other issues. However, Al Muamroon fails to present any argument—let alone evidence—in support of those issues. (App. br. at 6) Therefore, we deny the appeal on those grounds.

awarded Al Muamroon Contract No. W912D2-22-P0105 (Contract) (R4, tab 15 at 184). The Contract was a commercial items, firm fixed price contract to provide the government 4 bulldozers, 15 dump trucks, 2 backhoes, 2 hydraulic auger attachments, 6 front loaders, 8 graders, 3 hydraulic excavators, 3 bulk water trucks, 9 rollers, 1 bulk diesel fuel truck, 17 generator light sets, and 3 variable reach forklifts for a base period of three months in the Kingdom of Saudi Arabia for $3,314,487 (*id*. at 186-91). The Contract indicated that the dump trucks must "have an automatic transmission. Manual Transmission will not be acceptable" (R4 tab 18 at 293 (emphasis in original)).

2. An October 14, 2022 nonconformance report, which the government sent to Al Muamroon, stated that, on September 28, 2022, Al Muamroon delivered five dump trucks with manual transmissions, which the government rejected (R4 tabs 20-21). There is no contradictory evidence suggesting that Al Muamroon delivered automatic transmission dump trucks nor did Al Muamroon dispute it at the time or dispute it here. Therefore, we find that Al Muamroon delivered five nonconforming dump trucks with manual transmissions instead of automatic transmissions. The nonconformance report directed Al Muamroon to take corrective action by October 25, 2022 (R4, tab 21 at 322). There is no evidence that Al Muamroon took corrective action by delivering dump trucks with automatic transmissions.

3. On October 22, 2022, the government generated a memorandum indicating that Al Muamroon had not delivered certain equipment (R4, tab 23).

4. On November 8, 2022, the government partially terminated the Contract for the government's convenience, effective November 9, 2022 (R4, tab 27 at 331). In particular, the government terminated 4 bulldozers, 14 dump trucks, 7 graders, 3 bulk water trucks, 9 rollers, and 1 bulk diesel fuel truck (collectively, Terminated Equipment) (*id*. at 331-32).

5. On December 5, 2022, the government sent Al Muamroon a notice of intent to settle, which asserted that the government intended to reduce the contract price due to Al Muamroon's failure to deliver some of the Terminated Equipment—namely 14 dump trucks, 7 graders, 3 bulk water trucks, and 1 bulk diesel fuel truck (Undelivered Equipment) (R4, tab 31). Al Muamroon has not presented any contradictory evidence suggesting that it delivered the Undelivered Equipment prior to the Contract termination. On the contrary, in a December 20, 2022, email disputing the notice of intent to settle, Al Muamroon merely stated that it unsuccessfully attempted to deliver the Undelivered Equipment after Contract termination (R4, tab 33 at 1). Moreover, in response to interrogatories, Al Muamroon indicates that it was mobilizing the Undelivered Equipment when the government terminated the Contract (app. resp. to interrogatories 11(b)-(c), 12(b)-(c), 13(b)-(c), 14(b)-(c)). Therefore, we

2

find that Al Muamroon failed to deliver the Undelivered Equipment prior to the Contract termination.

6. Also on April 5, 2023, the contracting officer (CO) issued a final decision, which reduced the contract price by $1,294,734 from $3,314,487 to $2,019,753 (R4, tab 37 at 360).

7. On June 4, 2023, Al Muamroon submitted a claim, which contained a certification, disputing the CO's final decision (app. supp. R4, tab 18 at 2-10). The claim did not allege that the government terminated the Contract for operational concerns, any purported unfair and deceptive treatment, or the reason that the government terminated the Contract (*id.*). Instead, the claim focused exclusively upon whether the settlement amount determination was proper (*id.*). Subsequently, on June 29, 2023, Al Muamroon timely filed a notice of appeal from the CO's April 5, 2023 final decision.

II.     Al Muamroon's Purported Evidence of its Costs

    A.     Equipment Rental Costs

8. Al Muamroon asserts that it incurred costs to lease the Undelivered Equipment because the terms of the leases for that equipment from vendors required non-refundable, advanced payment for three-to-six months (R4, tab 28 at 337). In particular, Al Muamroon alleges in its Complaint that it leased under such terms: 4 dump trucks, 2 bulk water trucks, and 1 bulk diesel fuel truck from Alkurby Intl. (Alkurby); 10 dump trucks and 1 bulk water truck from Quality Resource for Industrial Co. (Quality); and 7 graders from Machine Rental Alternatives (Machine) (compl. 2-3).

9. Regarding Alkurby, Al Muamroon submits a document on Alkurby letterhead entitled "Equipment Lease Equipment" (Purported Alkurby Lease) (app. supp. R4, tab 10). The Purported Alkurby Lease is for 627,900 Saudi Riyal (SAR) "each month in advance on the first day of each month" (*id.*). Nothing in the Purported Alkurby Lease indicates that the rent was non-refundable (*id.*). There are no signatures—or even signature blocks—on the Purported Alkurby Lease (*id.*). The Purported Alkurby Lease is incomplete because it is one page but is numbered page 30, and ends mid-sentence (*id.*). Al Muamroon also submits an executed invoice from Alkurby (Alkurby Invoice), which states "ADVANCE PAYMENT" (R4, tab 35).

10. Regarding Quality, Al Muamroon submits a document on Quality Resource for Industrial Co. (Quality) letterhead entitled "Appendix (2) Conditions for Renting Construction Equipment" (Quality Appendix) (app. supp. R4, tab 9). The Quality Appendix is a blank form, missing a contract number, a date, a contract period, a rental

rate, an identification of the rented equipment, an identification of the lessee (Hirer), and signatures (*id*. at 1-2, 12). The Quality Appendix also is incomplete, as it starts on page 18 (*id*. at 1). The Quality Appendix states that "[t]he 'Hirer' Shall pay the <u>full amount in advance (non-refundable)</u> to the 'Owner,' at the address given in this Contract, the standard rental rates for the equipment at the beginning of each Gregorian month" (*id*. at 3 (emphasis in original)). Al Muamroon also submits an executed invoice from Quality (Quality Invoice), which states "100% Advance and non-refundable" (R4, tab 36).

11. Regarding Machine, Al Muamroon fails to submit any leases or lease appendices on Machinery letter-head or identifying Machine as the lessor (Owner). Instead, Al Muamroon submits a document entitled "Appendix (2) Conditions for Renting Construction Equipment," which identifies Zahid Tractor & Heavy Machinery Co. Ltd. (Zahid) as the Owner (Zahid Appendix) (app. supp. R4, tab 8 at 1, 7). There is no explanation of the relationship—if any—between Machine and Zahid (*id*.). Indeed, by identifying Machine and Zahid as separate companies, Al Muamroon recognizes that the two are different companies (app. resp. to interrogatories 17). The Zahid Appendix is a blank form, missing a contract number, a date, a contract period, a rental rate, an identification of the rented equipment, an identification of the leasee (Hirer), and signatures (app. supp. R4, tab 8 at 1-2, 7). The Zahid Appendix also is incomplete, as it starts on page 11 (*id*. at 1). The Zahid Appendix states that "[t]he 'Hirer' shall pay <u>in advance</u> to the 'Owner' . . . the standard rental rates for the equipment at the beginning of each [G]regorian month" (*id*. at 2 (emphasis in original)). Nothing in the Zahid Appendix indicates that the rent was non-refundable (*id*. at 1-7).

B.    Mobilization and Demobilization Costs

12. In support of its claim for mobilization and demobilization costs, Al Muamroon submits a spreadsheet dated November 8, 2022, on Logistics Import and Export letterhead (November Spreadsheet) (app. supp. R4, tab 11). There is no evidence who Logistics Import and Export is, or its basis for the November Spreadsheet (*id*.). The November Spreadsheet purports to show 66 instances of mobilization and demobilization costs for the Equipment in September and October 2022. The November Spreadsheet includes equipment besides the Undelivered Equipment, such as bulldozers, augers, loaders, and rollers. The November Spreadsheet shows a grand total of 516,235 SAR. (*Id*.) Al Muamroon also provided an undated spreadsheet (Undated Spreadsheet; collectively with the November Spreadsheet, Spreadsheets) during discovery (app. prod. of docs. tab CC4). There is no evidence who created the Undated Spreadsheet, or its basis (*id*.). The Undated Spreadsheet purports to show approximately 90 instances of mobilization and demobilization costs for the Equipment in September and October 2022 (*id*.). The Undated Spreadsheet includes equipment besides the Undelivered Equipment, such as

4

bulldozers, augers, loaders, and rollers (*id.*).  The Undated Spreadsheet shows a total mobilization cost of 422,200 and a total demobilization cost of 300,300—both presumably in SAR—which makes a grand total of 722,500 SAR (*id.*).

DECISION

We do not possess jurisdiction over Al Muamroon's BFTC because that is a new claim.  Therefore, we dismiss that claim.  While we possess jurisdiction over Al Muamroon's Settlement Amount Claim, Al Muamroon has failed to show that that claim has merit.  Thus, we deny the appeal as to that claim.  We explain the basis of our decision in more detail below.

I.  We Do Not Possess Jurisdiction Over Al Muamroon's Bad Faith Termination Claim Because That Is a New Claim

We do not possess jurisdiction over Al Muamroon's BFTC because that is a new claim.  Under the Contract Disputes Act (CDA), 41 U.S.C. § 7101 *et seq.*, the submission of a claim to the CO is a jurisdictional prerequisite for an appeal to the Board.  *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995).  Thus, we do not possess jurisdiction over new claims that a contractor did not present to the CO. *Lockheed Martin Aircraft Ctr.*, ASBCA No. 55164, 07-1 BCA ¶ 33,472 at 165,934. While the assertion of a new legal theory or additional facts does not render a claim a new claim, a claim presented to the Board is a new claim if it is not based upon facts that are common, or related, to the facts that the contractor raised in its claim to the CO.  *Id.*  In particular, in order to raise a BFTC on appeal, the contractor need not have used the words "bad faith" in its claim to the CO, but it must have alleged, in effect, unfair and deceptive treatment.  *Id.*

Here, the BFTC is not based upon facts that are common, or related, to the facts that Al Muamroon raised in its claim to the contracting officer.  On appeal, Al Muamroon bases its BFTC upon the purported unfair and deceptive treatment of terminating the contract due to the government's operational concerns, instead of Al Muamroon's deficient performance (app. br. 6).[2]  Those facts are not common, or related, to the facts that Al Muamroon raised in its claim to the CO because the claim to the CO did not allege that the government terminated the Contract for operational concerns (finding 7).  Indeed, Al Muamroon's claim to the CO did not allege any purported unfair and deceptive treatment, or even make any allegations regarding the

---

[2] To be clear, we do not find that termination "for operational concerns" would necessarily be an act of bad faith here, *see Vec-Tor, Inc.*, ASBCA No. 25807, 85-1 BCA ¶ 17,755 at 88,677; rather, that Al Muamroon has alleged that this is what made the termination a bad faith one.  Even on those terms, Al Muamroon did not make such an allegation to the CO.

reason that the government terminated the Contract (finding 7). Instead, the claim to the CO focused exclusively upon whether the settlement determination was proper (finding 7). Because the BFTC raised in this appeal is not based upon facts that are common, or related, to the facts that Al Muamroon raised in its claim to the CO, it is a new claim over which we do not possess jurisdiction.

II.     While we Possess Jurisdiction Over Al Muamroon's Settlement Amount Claim, That Claim Fails on the Merits

While we possess jurisdiction over the Settlement Amount Claim, Al Muamroon has failed to show that the settlement amount was improper.

A.     We Possess Jurisdiction Over Al Muamroon's Settlement Amount Claim

The government's argument that we do not possess jurisdiction over Al Muamroon's Settlement Amount Claim because Al Muamroon failed to certify its claim for over $100,000 is meritless (gov't reply 5-6). The CDA requires that all claims exceeding $100,000 contain a certification. 41 U.S.C. § 7103(b). Thus, while a defect in the certification does not deprive us of jurisdiction, the lack of a certification does deprive us of jurisdiction. *Tefirom Insaat Enerji Sanayi Ve Ticaret A.S.*, ASBCA No. 56667, 11-1 BCA ¶ 34,628 at 170,630. Here, the June 4, 2023 claim contained a certification (finding 7). Indeed, the government recognized as much when it successfully withdrew an earlier motion to dismiss for failure to certify the claim, stating that "the Government acknowledges that a certified claim was received by the Government on June 4, 2023" (mot. to withdraw (Nov. 2, 2023)). Because Al Muamroon certified its claim, we possess jurisdiction over Al Muamroon's Settlement Amount Claim.

B.     Al Muamroon Has Failed To Show That the Settlement Amount Was Improper

Al Muamroon has failed to show that the settlement amount was improper. The overall purpose of a termination for convenience settlement is to fairly compensate the contractor, and to make it whole for the costs it incurred in connection with the terminated work. *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,223. The contractor is not supposed to suffer as a result of a termination for convenience of the government, nor to underwrite the government's decision to terminate. *Id.* When the government terminates a contract for commercial products or services for its convenience—as was the case here (findings 1, 4)—the contractor shall be paid:

> (i)     (A)     The percentage of the contract price
> reflecting the percentage of the work performed prior to

6

the notice of the termination for fixed-price or fixed-price
with economic price adjustment contracts; or

(B)     An amount for direct labor hours (as defined in the
Schedule of the contract) determined by multiplying the
number of direct labor hours expended before the effective
date of termination by the hourly rate(s) in the Schedule;
and

(ii)     Any charges the contractor can demonstrate directly
resulted from the termination.  The contractor may
demonstrate such charges using its standard record keeping
system . . . .

48 C.F.R. § 12.403(d); *see also id*. at 52.212-4(l).[3]

We segregate Federal Acquisition Regulation (FAR) §§ 12.403(d) and 52.212-4(l) into two prongs allowing for the recovery of monetary amounts: (1) a percentage of the contract price reflecting the percentage of work performed (First Prong); and (2) the reasonable charges that have resulted from the contract termination (Second Prong).  *Dellew Corp.*, ASBCA No. 58538, 15-1 BCA ¶ 35,975 at 175,783.  Under the First Prong, a contractor is entitled to the "price of work performed under the contract prior to notice of termination."  *Id*.  There can be no recovery under the First Prong if the government terminates the contract for convenience before work was performed under the contract.  *Id*.  Under the Second Prong, a contractor is entitled to "settlement expenses . . . [and] costs resulting from the termination."  *Id*.  The costs resulting from the termination include "reasonable expenses incurred [prior to the termination for convenience] in preparation for the terminated portion of the contract."  *Id*.

It is a contractor's burden to prove by a preponderance of the evidence that it is entitled to a greater termination settlement amount than that determined by the CO.  *SWR*, 15-1 BCA ¶ 35,832 at 175,225.  A contractor must "prove the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation."  *Id*. (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (citation omitted)).

Here, Al Muamroon argues that it is entitled to recover for:  (1) the rent it paid for the five rejected manual transmission dump trucks; (2) the rent it paid for other

---

[3] Al Muamroon cites FAR 12.403(c) for the proposition that the government had to equitably reimburse it for all reasonable costs incurred in good faith (app. br. 7). However, FAR 12.403(c) addresses terminations for cause, *see* 48 C.F.R. § 12.403(c), and the government terminated for convenience here (finding 4).

Undelivered Equipment besides those dump trucks (Other Undelivered Equipment); (3) the costs it incurred mobilizing and demobilizing the Undelivered Equipment; and (4) the value added tax on the Undelivered Equipment (compl. 1). As discussed below, none of those arguments have merit.[4]

   1.   Al Muamroon Has not Shown That it Is Entitled to Compensation for the Five Manual Transmission Dump Trucks

Al Muamroon has not shown that it is entitled to compensation for the five manual transmission dump trucks under either prong. Under the First Prong, the contractor had completed zero percent of the contract regarding equipment prior to the termination for convenience—and thus is not entitled to any compensation for that equipment—if a contractor attempts to deliver equipment that does not comply with a contract's requirements, the government rejects that equipment, and the contractor fails to correct the defect before the termination. *Green Bay Logistics Services, Co.*, ASBCA No. 61063, 18-1 BCA ¶ 37,031 at 180,307. Here, Al Muamroon has failed to show that the five dump trucks that it attempted to deliver complied with the Contract's requirements. On the contrary, the Contract unequivocally stated that the dump trucks must "have an automatic transmission. Manual Transmission will not be acceptable." (finding 1). However, the five dump trucks had manual transmissions (finding 2). As a result of that non-conformance, the government properly rejected the five manual transmission dump trucks (finding 2). Moreover, Al Muamroon has presented no evidence that it corrected that defect before the termination (finding 2). Therefore, it completed zero percent of the Contract regarding the five manual transmission dump trucks, and thus is not entitled to any compensation for that equipment under the First Prong. *See Green Bay Logistics Services*, 18-1 BCA ¶ 37,031 at 180,307.

Nor is Al Muamroon entitled to compensation for the five manual transmission dump trucks under the Second Prong. If equipment that a contractor leased in preparation to perform the terminated contract does not comply with the contract's requirements, then the expenses incurred leasing that non-conforming equipment is not reasonable, and thus the contractor is not entitled to any compensation for that equipment under the Second Prong. *Green Bay Logistics Services*, 18-1 BCA ¶ 37,031 at 180,307. Here, the five manual transmission dump trucks did not conform with the Contract's requirements for the reasons discussed above (findings 1-2). Therefore, the expense Al Muamroon incurred leasing that equipment was not reasonable, and Al Muamroon is not entitled to any compensation for the five manual transmission

---

[4] Because we conclude that Al Muamroon is not entitled to compensation for the Undelivered Equipment, we hold that it is not entitled to compensation for the value added tax on that equipment.

8

dump trucks under the Second Prong. *See Green Bay Logistics Services*, 18-1 BCA ¶ 37,031 at 180,307.

2. Al Muamroon Has not Shown That it Is Entitled To Recover For the Other Undelivered Equipment

Al Muamroon has not shown that it is entitled to recover for the Other Undelivered Equipment. Under the First Prong, Al Muamroon is not entitled to recover the contract price for the Other Undelivered Equipment. Al Muamroon has not shown that it delivered the Other Undelivered Equipment prior to the termination (finding 5), so Al Muamroon has failed to show that it performed any percent of the work regarding the Other Undelivered Equipment prior to the termination. *See Green Bay Logistics Services*, 18-1 BCA ¶ 37,031 at 180,307.

Nor has Al Muamroon shown that it is entitled to recover the costs it incurred leasing the Other Undelivered Equipment under the Second Prong because Al Muamroon has failed to establish using its standard recordkeeping system that it incurred reasonable charges renting the Other Undelivered Equipment that it reasonably could not avoid (gov't br. at 40). "[C]osts which cannot be discontinued immediately after the effective date of a termination are generally allowable." *Info. Sys. & Networks Corp.*, ASBCA No. 46119, 02-2 BCA ¶ 31,952 at 157,876. In particular:

> Rental costs under unexpired leases, less the residual value of such leases, are generally allowable when shown to have been reasonably necessary for the performance of the terminated contract, if—
>
> (1)    The amount of rental claimed does not exceed the reasonable use value of the property leased for the period of the contract and such further period as may be reasonable; and
>
> (2)    The contractor makes all reasonable efforts to terminate, assign, settle, or otherwise reduce the cost of such lease.

48 C.F.R. 31.205-42(e); *see also Info. Sys. & Networks Corp.*, 02-2 BCA ¶ 31,952 at 157,876; *SWR*, 15-1 BCA ¶ 35,832 at 175,226-28. In order to recover such rental costs, a contractor must establish using its standard recordkeeping system that it incurred reasonable charges, and that it reasonably could not avoid such rental costs, by providing the underlying supplier leases or adequate evidence of their terms. *Dehdari Gen. Trading & Contracting Est.*, ASBCA No. 53987, 03-1 BCA ¶ 32,249

9

at 159,449-50 (holding, in a non-binding decision, that a contractor seeking eleven months of rental costs failed to show that it incurred reasonable charges renting the equipment that it could not avoid, when it failed to provide the underlying supplier leases or evidence of their terms—including whether the equipment was returnable for a refund).

Here, Al Muamroon argues that it incurred reasonable charges renting the Other Undelivered Equipment for three months under unexpired leases that it reasonably could not avoid by returning the equipment for a refund because the terms of its leases with Alkurby, Quality, and Machine required non-refundable, advanced payment for three months (finding 8; compl. at 2). However, Al Muamroon has failed to satisfy its burden of proving that the terms of a lease with Alkurby required non-refundable, advanced payment for three months. Indeed, Al Muamroon fails to submit an executed and complete lease with Alkurby (finding 9); *see also SWR, Inc.*, 15-1 BCA ¶ 35,832 at 175,229-30 (holding that an unexecuted quote failed to establish that a contractor incurred an obligation). Moreover, the Purported Alkurby Lease only required advanced payment for one month—not three months—stating that rent was due "each month in advance on the first day of each month." (finding 9). In any event, nothing in the Alkurby Purported Lease indicated that even that one-month advanced payment was non-refundable (finding 9). Because Al Muamroon has failed to establish that the terms of a lease with Alkurby required non-refundable, advanced payment for three months, it has not shown using its standard recordkeeping system that it incurred reasonable charges for leasing the Other Undelivered Equipment from Alkurby for three months that it could not avoid.

Similarly, Al Muamroon has failed to show that the terms of a lease with Quality required non-refundable, advanced payment for three months. Al Muamroon fails to submit an executed and complete lease with Quality (finding 10). Indeed, the Quality Appendix that Al Muamroon submits is a blank form missing the key terms, such as the date, the contract period, the rental rate, the rental equipment, and the lessee (finding 10). Moreover, while the Quality Appendix indicates that payment is non-refundable, it only required advanced payment for one month—not three months (finding 10).[5] Because Al Muamroon has failed to establish that the terms of a lease with Quality required non-refundable, advanced payment for three months, it has not shown using its standard recordkeeping system that it incurred reasonable charges for leasing the Other Undelivered Equipment from Quality for three months that it could not avoid.

---

[5] While the Alkurby and Quality Invoices indicated advanced payment they did not specify whether that was advance payment for one month, or for three months (findings 9-10). The Purported Alkurby Lease and the Quality Appendix discussed above clarify that the advanced payment was only for one month (findings 9-10).

Al Muamroon also has failed to show that the terms of a lease with Machine required non-refundable, advanced payment for three months. Al Muamroon fails to submit any document even purporting to be a lease from Machine (finding 11). Instead, Al Muamroon submits an appendix from an entirely different company—Zahid—and there is no evidence of the relationship—if any—between Machine and Zahid (finding 11). Moreover, the Zahid Appendix is unexecuted and incomplete (finding 11). Indeed, the Zahid Appendix is a blank form missing the key terms, such as the date, the contract period, the rental rate, the rental equipment, and the lessee (Hirer) (finding 11). Further, the Zahid Appendix only required advanced payment for one month—not three months—stating that "[t]he 'Hirer' shall pay in advance to the 'Owner' . . . the standard rental rates for the equipment at the beginning of each [G]regorian month" (finding 11). In addition, there was nothing in the Zahid Appendix indicating that even that one-month advanced payment was non-refundable (finding 11). Because Al Muamroon has failed to establish that the terms of a lease with Machine required non-refundable, advanced payment for three months, it has not shown using its standard recordkeeping system that it incurred reasonable charges for leasing the Other Undelivered Equipment from Machine for three months that it could not avoid.

Al Muamroon argues that affidavits and third-party attestations could support a regional business preference for equipment leases that include non-refundable, advanced payment for at least three month terms (app. br. at 5). However, we generally do not rely solely upon testimony to establish incurred costs. *See SWR, Inc.*, 15-1 BCA ¶ 35,832 at 175,230; *First Div. Design, LLC*, ASBCA No. 60049, 18-1 BCA ¶ 37,201 at 181,102. Moreover, Al Muamroon fails to actually submit any affidavits or third-party attestations (app. br.). Thus, because Al Muamroon has not shown using its standard recordkeeping system that it incurred reasonable charges for leasing the Other Undelivered Equipment for three months that it could not avoid, it has failed to establish entitlement to rent for the Other Undelivered Equipment under the Second Prong.

3. Al Muamroon Has Failed To Show That it Is Entitled To Recover any Mobilization and Demobilization Costs

Al Muamroon has failed to show that it incurred mobilization or demobilization costs with sufficient certainty so that the determination of the amount of damages will be more than mere speculation. Al Muamroon fails to identify the authors and bases for the Spreadsheets upon which it relies (finding 12). Moreover, it is unclear from the Spreadsheets which mobilization and demobilization costs—if any—purportedly are for the Undelivered Equipment, and the Spreadsheets show different mobilization and demobilization costs (finding 12). Absent any explanation of the costs it incurred mobilizing and demobilizing Undelivered Equipment, we are left to speculate as to

11

such costs.  Therefore, Al Muamroon has failed to satisfy its burden of establishing its mobilization and demobilization costs for the Undelivered Equipment.

CONCLUSION

For the foregoing reasons, we dismiss without prejudice Al Muamroon's Bad Faith Termination Claim.  We deny the remainder of the appeal.

Dated:  July 11, 2025

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63648, Appeal of Al Muamroon Trading, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals